THE STATE OF OHIO, APPELLEE, *v.* STEFFEN, APPELLANT.

[Cite as State *v.* Steffen (1987), 31 Ohio St. 3d 111.]

112

(No. 86-193—Decided June 24, 1987.)

*Arthur M. Ney, Jr.,* prosecuting attorney, *Leonard Kirschner, Claude N. Crowe, Steven M. Tolbert* and *William E. Breyer,* for appellee.

*H. Fred Hoefle* and *William Flax,* for appellant.

Douglas, J. The instant appeal presents this court with numerous issues concerning the appellant's convictions and the penalty of death subsequently imposed. For the reasons discussed *infra,* we affirm the judgment of the court of appeals in all respects and uphold appellant's death sentence.

Appellant's first two propositions of law challenge the trial court's instruction to the jury that their recommendation of death would not be binding on the court, and that the final responsibility for the imposition of the death penalty rests with the court. Appellant cites *Caldwell* v. *Mississippi* (1985), 472 U.S. 320, for the proposition that such an instruction impermissibly reduces the jury's sense of responsibility and increases the likelihood of a recommendation of death. Appellant further submits that this error was compounded by the court's statement that "* * * [t]he

final decision as to whether the death penalty shall be imposed upon the defendant rests upon this Court after the Court follows certain additional procedures required by the laws of this State."

A substantially similar instruction[1] was considered by this court in *State* v. *Buell* (1986), 22 Ohio St. 3d 124, 22 OBR 203, 489 N.E. 2d 795. There, we rejected an identical argument that such an instruction is unconstitutional under *Caldwell. Buell* at 142-144, 22 OBR at 219-220, 489 N.E. 2d at 811-813. See, also, *State* v. *Rogers* (1986), 28 Ohio St. 3d 427, 28 OBR 480, 504 N.E. 2d 52; *State* v. *Williams* (1986), 23 Ohio St. 3d 16, 21-22, 23 OBR 13, 18-19, 490 N.E. 2d 906, 912. We are not persuaded to alter that position by appellant's argument herein.

Appellant's third proposition of law argues that the use of the same felony twice, to elevate the offense to aggravated murder and again to elevate it to capital aggravated murder, fails to narrow the class of offenders eligible for the death penalty. This court has previously rejected this argument. *State* v. *Jenkins* (1984), 15 Ohio St. 3d 164, 177-178, 15 OBR 311, 322-323, 473 N.E. 2d 264, 279-280; *Buell, supra,* at 141-142, 22 OBR at 218, 489 N.E. 2d at 810-811; *State* v. *Barnes* (1986), 25 Ohio St. 3d 203, 206-207, 25 OBR 266, 269, 495 N.E. 2d 922, 924-925. For the reasons set forth in those decisions, we adhere to that position today.

In his fourth, fifth, sixth and seventh propositions of law, appellant attacks the legal sufficiency of his conviction for aggravated burglary and of the aggravating circumstance based thereon. His threshold argument maintains that the trial court erred in instructing the jury that one who lawfully enters premises becomes a trespasser[2] subject to conviction for burglary by virtue of the commission of a felony on the premises. Citing this court's holding in *State* v. *Barksdale* (1983), 2 Ohio St. 3d 126, 2 OBR 675, 443 N.E. 2d 501, appellant argues that once the privilege to enter the premises is granted, as here,[3] that privilege is not vitiated by the subsequent commission of a felony thereon.

We cannot agree with this application of our holding in *Barksdale, supra.* There, the accused entered an automobile dealer's car lot, open to the public, and broke into a locked car. This court struck down the ac-

---

[1] The instruction in *Buell* read as follows:

"A jury recommendation to the Court that the death penalty be imposed is just that. A recommendation. And it is not binding upon the Court. The final decision as to whether the defendant will be sentenced to death or to life imprisonment will be made by me, the Judge, after following the procedure and applying the criteria set forth in the statutes." *Id.* at 143, 22 OBR at 220, 489 N.E. 2d at 812.

[2] R.C. 2911.11, aggravated burglary, provides in pertinent part:

"(A) No person, by force, stealth, or deception, shall *trespass* in an occupied structure * * *." (Emphasis added.)

[3] Appellant, the only surviving witness to the encounter between himself and Karen Range, testified that Karen permitted him to enter her home.

cused's subsequent conviction for breaking and entering on the basis that the state had failed to prove the essential element of trespass. In so holding, we reasoned that the automobile dealer's tacit invitation to the general public to enter the lot was a grant of privilege and that one who entered the lot with the purpose of committing a felony thereon did not relinquish that privilege and, therefore, no trespass had been demonstrated.

The instant case is readily distinguishable from *Barksdale*. First, a private home is involved herein while *Barksdale* involved a used car lot open to the general public. The interest of a private person in the inviolability of his home is materially greater than that of a business owner in his business premises, particularly where the business premises are open to the public. Moreover, a privilege once granted may be revoked. In the case *sub judice*, unlike in *Barksdale*, the felony committed, once on the premises, was one of violence, directed against a human being who had the ability and the authority to revoke the privilege of initial entry, if such privilege was in fact granted as appellant testified.[4] We note further that R.C. 2911.21(A), defining criminal trespass, provides that:

"No person, without privilege to do so, shall do any of the following:

"(1) Knowingly enter or *remain* on the land or premises of another * * *." (Emphasis added.)

Under the circumstances of this case, even assuming lawful initial entry, the jury was justified in inferring from the evidence that appellant's privilege to remain in Karen's parents' home terminated the moment he commenced his assault on her. Appellant does not deny striking Karen repeatedly before killing her. From that undisputed fact, a powerful inference arises that appellant was no longer privileged to remain in Karen's parents' home, and that he knew his privilege had been terminated. In our view, this inference is so strong that it excludes the possibility of drawing from the same facts any other reasonable inference supporting a theory of innocence. See *State* v. *Kulig* (1974), 37 Ohio St. 2d 157, 66 O.O. 2d 351, 309 N.E. 2d 897, syllabus. We find no error in the trial court's instruction to the jury, nor are we persuaded that the state failed to prove the essential element of trespass.

In his eighth proposition of law, appellant contends that the trial court erred in considering the nature and circumstances of the offense, the future dangerousness of the accused, and the public demand for retribution as aggravating factors in making its sentencing determination, while giving no consideration whatsoever to the mitigating factors of youth and cooperation with law enforcement authorities.[5] As to the trial court's pur-

---

[4] The car lot in *Barksdale* was closed at the time of the accused's entry thereon. Thus, it may safely be assumed that there was no one present to revoke the privilege of entry.

[5] R.C. 2929.04 provides in pertinent part:

ported reliance on the factors of appellant's future dangerousness and the public's demand for retribution, the remarks to which appellant objects[6] appear only in the court's oral statement in open court before sentencing. No mention of such factors is made in the actual written opinion of the court. Viewing the record as a whole, and mindful of the presumption of correctness in the proceedings below, we do not consider these two brief remarks to carry such significance as to taint the entire process of sentence determination in this case. See *State* v. *Coombs* (1985), 18 Ohio St. 3d 123, 125, 18 OBR 153, 155, 480 N.E. 2d 414, 416-417.

Nor do we find error in the trial court's consideration of the nature and circumstances of the offense.[7] R.C. 2929.04(B) provides that the

---

"(B) If one or more of the aggravating circumstances listed in division (A) of this section is specified in the indictment or count in the indictment and proved beyond a reasonable doubt, * * * the court, trial jury, or panel of three judges shall consider, and weigh against the aggravating circumstances proved beyond a reasonable doubt, the nature and circumstances of the offense, the history, character, and background of the offender, and all of the following factors:

"(1) Whether the victim of the offense induced or facilitated it;

"(2) Whether it is unlikely that the offense would have been committed, but for the fact that the offender was under duress, coercion, or strong provocation;

"(3) Whether, at the time of committing the offense, the offender, because of a mental disease or defect, lacked substantial capacity to appreciate the criminality of his conduct or to conform his conduct to the requirements of the law;

"(4) The youth of the offender;

"(5) The offender's lack of a significant history of prior criminal convictions and delinquency adjudications;

"(6) If the offender was a participant in the offense but not the principal offender, the degree of the offender's participation in the offense and the degree of the offender's participation in the acts that led to the death of the victim;

"(7) Any other factors that are relevant to the issue of whether the offender should be sentenced to death."

[6] The relevant remarks by the trial court read as follows:

"* * * [Appellant's] battered childhood was terribly unfortunate but has not, from the overwhelming weight of the professional evidence, caused him to be psychotic. It has perhaps been responsible, to some degree, in causing him to be a person with superficial and shallow restraints. More significantly, it has developed a person with dangerous propensities likely to explode at any time. The * * * [appellant] has been described as a human time bomb waiting to explode. He did just that in this case and the results were devastating. There is no evidence to suggest that the same type of delayed explosive reaction could not occur again unless action is now taken to permanently prevent it.

"This is what the Legislature had in mind when it passed the new death penalty law. The Legislature was reacting to the demands of the public for retribution and this is an appropriate case to provide such retribution."

[7] The relevant text in the trial court's opinion reads:

"* * * The true circumstances of the offense can be gleaned from the testimony of the State's witnesses who described the scene, the victim's condition, the condition and location of her torn clothes and the presence of semen both in the victim's vagina and in her panties and the presence of spermatozoa. There is ample evidence to indicate the very sordid nature of the offense and its specific consequences.

court, in determining whether death is an appropriate penalty, *"shall consider,* and weigh against the aggravating circumstances proved beyond a reasonable doubt, *the nature and circumstances of the offense * * *."* (Emphasis added.) Thus, the court is *required* to review this factor. However, appellant appears to contend that the trial court's remarks on this subject reveal that it viewed the nature and circumstances of the offense herein as aggravating rather than mitigating as required by R.C. 2929.04(B). We do not agree. The statute merely requires that the court consider this factor in determining the mitigating factors to be weighed against the proven aggravating circumstances. Obviously, the nature and circumstances of certain offenses will be such that no mitigating feature can be extracted. By its statement on the gruesome and vicious nature of the murder, the trial court herein was merely justifying its conclusion that no mitigating factors can be gleaned from the nature and circumstances of this particular offense. We find nothing improper in the court's remarks.

Nor did the trial court fail to consider the mitigating factors of appellant's youth and cooperation with law enforcement authorities. The court did in fact consider the youth of the offender, but found it to be non-mitigating.[8] As to appellant's cooperation with law enforcement authorities,[9] appellant offered almost no evidence on this factor,[10] and, in any event, appellant's cooperation was minimal at best. He attempted to cover up his involvement in the crime by concealing evidence and giving a false robbery report to police. While it is true that appellant eventually confessed to the murder, this came only after initially denying involvement when confronted and then concocting a story about an imaginary adopted brother who committed the murder while appellant was in the next room. Appellant has always denied the rape. We do not consider this history as depicting cooperation with law enforcement authorities.

---

"It should be noted, from the * * * [appellant's] appearance in the courtroom that he was physically over-developed. He had a massively well developed chest and upper arms. It is evident that he either exercised regularly or worked out on muscle developing equipment. He looked every bit the part of an extremely strong person even though he wore glasses, suggesting that he had very poor eyesight and spoke very softly. The last moments in the life of Karen Range, in that small bathroom, and in very close proximity to the * * * [appellant], it must logically be inferred were filled with horror and pain."

[8] The trial court's remarks regarding the youth of the offender read as follows:
"(4) 'The youth of the offender.' The Court finds that the defendant was born December 22, 1959, and at the time of this trial was twenty-three years of age. There is absolutely no evidence to suggest that he was a youthful offender or that his age was a factor that should be taken into account in mitigation of the sentence of death. This factor was not present."

[9] The factor of the offender's cooperation with law enforcement authorities is not among those specifically enumerated in R.C. 2929.04(B)(1) through (6), but it may arguably fall within the catch-all provision of R.C. 2929.04(B)(7).

[10] The probation officer who prepared the presentence report agreed at trial, in response to questioning, that appellant's behavior during the interview was "cooperative."

By propositions of law nine, ten and eleven, appellant attacks the sufficiency of the evidence to support his conviction of rape and the corresponding specification. Our review of the record reveals that the evidence was such that the jury could reasonably find that the victim had been raped and that appellant was the perpetrator.[11] Whether a rape had been committed, and by whom, are questions for the jury. A reviewing court will not disturb a jury verdict where there is substantial evidence supporting a reasonable conclusion that all elements of the offense were proven beyond a reasonable doubt. *State* v. *Eley* (1978), 56 Ohio St. 2d 169, 10 O.O. 3d 340, 383 N.E. 2d 132, syllabus. Appellant's rape conviction and the corresponding specification must stand.

Appellant contends in his thirteenth proposition of law that the trial court erred in failing to state in a separate opinion its specific findings regarding mitigating and aggravating circumstances and why the latter outweighed the former, as required by R.C. 2929.03(F).[12] We have thoroughly examined the opinion of the trial court and we conclude that it reflects full compliance with the requirements of the statute. The opinion outlines the aggravating circumstances of which appellant was found guilty beyond a reasonable doubt and considers in detail each of the potential mitigating factors. In a lengthy analysis of the evidence offered in mitigation, the trial court repeatedly explained why this evidence was entitled to relatively little weight. In sum, the opinion reveals that the trial judge was fully cognizant of his duties under R.C. 2929.03(F) and complied with the statute diligently and completely. Appellant's argument is without merit.

The fourteenth proposition of law involves appellant's motion to the

---

[11] Quantities of semen were found in the victim's vagina, around the pubic region and on her underwear. Tests conducted on the semen failed to exclude appellant as the depositor, and disclosed the presence of living sperm, indicating that the semen was recently deposited. Further evidence established that the semen was probably deposited while the victim was prone without her ever again being ambulatory. A bruise was observed on the inside of the victim's upper thigh, consistent with the use of force. The victim's shorts and panties had been ripped open to expose her pubic region, and her blouse was also torn, exposing her breasts. A perfectly formed, uncongealed drop of unsmeared blood was found on the victim's pubic region, indicating that had sexual intercourse occurred after the drop had fallen there, it would have been smeared, leading to an inference that intercourse had taken place before, and very recently before, the drop fell. At the time she was found, the victim's hair was still wet from a shower, again indicating that the semen had been very recently deposited, since the shower would have rinsed it away. All this evidence leads to a compelling conclusion that a rape had occurred and that appellant was the perpetrator.

[12] R.C. 2929.03(F) provides in pertinent part:

"The court or the panel of three judges, when it imposes sentence of death, shall state in a separate opinion its specific findings as to the existence of any of the mitigating factors set forth in division (B) of section 2929.04 of the Revised Code, the existence of any other mitigating factors, the aggravating circumstances the offender was found guilty of committing, and the reasons why the aggravating circumstances the offender was found guilty of committing were sufficient to outweigh the mitigating factors. * * *"

court of appeals, filed over two years after the trial court's entry of its judgment of convictions and sentence, requesting remand of the cause to the trial court for a ruling by that court on appellant's motion for a new trial. The trial court denied the new trial motion without prejudice to its eventual refiling. The court of appeals then denied the motion for remand on the basis that the grounds for retrial were insufficient. Appellant argues that the court of appeals erroneously considered the merits of the motion for a new trial, which motion was not before that court.

We note at the outset that appellant's notice of appeal to this court appeals only from the appellate court's judgment of December 11, 1985 affirming his conviction and sentence. Thus, the appellate court's ruling on the motion for remand is not properly before this court. In any event, we fail to see any prejudice resulting to appellant from the appellate court's denial of his motion to remand since the trial court had already denied the motion for new trial without prejudice.

Appellant's fifteenth proposition of law alleges prejudicial error in the admission of certain testimony by the victim's mother. The following exchange occurred during direct examination of Mrs. Range by the prosecutor:

"Q.   Did you have occasion to discuss sexual matters with * * * [your daughter Karen]?

"A.   Yes, we did.

"Q.   What did she tell you?

"A.   She said that she would remain a virgin until —

"MR. STUEVE:   Objection to that, Your Honor. That's hearsay.

"THE COURT:   Objection overruled. The answer may stand."

Appellant asserts that Karen's statement to her mother was inadmissible hearsay, subject to no exception, and its admission constituted prejudicial error. The state counters that the statement was hearsay, but admissible under the exception to the rule relating to statements of then existing physical condition. We cannot agree completely with either argument.

Karen's statement of her intent to remain a virgin is hearsay under Evid. R. 801(C).[13] It clearly qualifies as an out-of-court statement "offered in evidence to prove the truth of the matter asserted" within the meaning of the rule. The state does not dispute this. As hearsay, the statement is not admissible unless subject to a relevant exception. Evid. R. 802.

We do not agree with the state's contention that the statement falls within the exception embodied in Evid. R. 803(3)[14] for a then existing

---

[13] Evid. R. 801(C) provides:

"Hearsay. 'Hearsay' is a statement, other than one made by the declarant while testifying at the trial or hearing, offered in evidence to prove the truth of the matter asserted."

[14] Evid. R. 803(3) provides in pertinent part:

"*Then existing mental, emotional or physical condition.* A statement of the declarant's

physical condition. In discussing this "physical condition" exception, the authorities repeatedly speak solely in terms of physical pain, symptoms or sensations. See, *e.g.,* 4 Weinstein & Berger, Weinstein's Evidence (1985) 803-103, Paragraph 803(3)[01]; 4 Louisell & Mueller, Federal Evidence (1980) 518, Section 440; 2 Gard, Jones on Evidence (6 Ed. 1972) 266, Section 10:6; 11 Moore's Federal Practice (2 Ed. 1985) VIII-83, Section 803(3)[5]. We believe that this exception was never intended to apply to a physical condition such as virginity.

An argument may be made that Karen's statement is admissible under the "then existing state of mind" exception in Evid. R. 803(3) in that the statement evinced Karen's intent to refrain from sexual intercourse until some point in time, unidentified, but with a strong implication that she would remain a virgin until her impending marriage. In that light, the statement apparently would have been offered to show that Karen would not have consented to intercourse with appellant. "It has long been settled that the state-of-mind exception may be used as the basis for introducing statements showing the forward-looking intent of the declarant for the purpose of proving that he thereafter acted in accordance with that intent." 4 Louisell & Mueller, Federal Evidence, *supra,* at 540, Section 442. However, this argument is unpersuasive. The relevance of Karen's statement to the issue of her non-consent is tenuous at best. Even clearly relevant evidence is inadmissible if its probative value is substantially outweighed by a danger of unfair prejudice. Evid. R. 403(A). The potential for prejudice in Karen's statement is considerable. We believe it should not have been admitted. However, we are compelled to conclude that this error was, in the final analysis, harmless. Even if this hearsay testimony were excluded from consideration, the overwhelming persuasiveness of the remaining evidence would still be undeniable. Appellant confessed to the murder and there was substantial physical evidence to support his conviction of rape beyond a reasonable doubt. Thus, the error was harmless. See Crim. R. 52(A); *Buell, supra,* at 135, 22 OBR at 212-213, 489 N.E. 2d at 805-806.

Appellant urges in his sixteenth proposition of law that the trial court erred in granting the state's motions to excuse six prospective jurors because of their objections to capital punishment where four of these six persons were not unequivocal in their opposition to the death penalty and where none of the six was asked whether he would follow the instructions of the court in spite of his personal beliefs. However, appellant misapprehends the standards applicable in this setting. This court has held that "[t]he proper standard for determining when a prospective juror may be excluded for cause based on his views on capital punishment is whether the juror's views would prevent or substantially impair the performance of

---

then existing state of mind, emotion, sensation, or physical condition (such as intent, plan, motive, design, mental feeling, pain, and bodily health) * * *."

his duties as a juror in accordance with his instructions and oath." *State* v. *Rogers* (1985), 17 Ohio St. 3d 174, 17 OBR 414, 478 N.E. 2d 984, paragraph three of the syllabus. An examination of the record reveals that each of the prospective jurors in question stated either that under no circumstances whatsoever could he join in a recommendation of death or that he believed his conscience or religious beliefs would prevent him from following the court's instructions in that regard. This court is satisfied that the trial court's orders excusing these jurors for cause are amply supported by the record in each instance.

By his seventeenth proposition of law, appellant contends that the trial court deprived him of due process and the effective assistance of his counsel by affording inadequate time to prepare for the penalty phase of the proceedings. The trial court granted the defense a three-day continuance. Appellant argues that this was inadequate time for preparation. We do not agree.

At the conclusion of the guilt phase on May 17, 1983, over seven months had elapsed since appellant was arraigned on the instant charges. During that time, appellant was provided a psychologist to assist him in his defense. At the trial, defense counsel developed an extensive review of appellant's troubled childhood, personal background and emotional make-up, both through appellant's own testimony and through a psychological expert. At least two psychiatric reports were made at the request of the defense. Friends and family of the appellant were interviewed, many of whom testified at trial. Given the fact that defense counsel, in the face of appellant's admission to the murder and the quantity of evidence against him, must have at least contemplated the possibility of a guilty verdict, this court is persuaded that counsel had sufficient time and opportunity to prepare adequately for the penalty phase of this proceeding.

Appellant's eighteenth proposition of law challenges the admission of a presentence report prepared by a probation officer, where the officer had advised appellant that any statements made to him by appellant would remain confidential. This argument is without merit. Appellant requested this report himself. Indeed, no such report may be made in capital cases except upon the request of the defendant. R.C. 2929.03(D)(1). R.C. 2929.03(D)(1) further provides that once a presentence report is made, copies "* * * *shall* be furnished to the court, *to the trial jury if the offender was tried by a jury,* to the prosecutor, and to the offender or his counsel" (emphasis added) for consideration in determining the appropriate sentence. As this court has noted previously, "* * * the defendant decides whether to expose himself to the risk of potentially incriminating presentence investigations, including mental examinations. * * * [T]he jury should be privy to all information relevant to its task of deciding whether a defendant should be sentenced to life in prison or whether it should recommend that defendant be put to death." *Buell, supra,* at 138, 22 OBR at 215, 489 N.E. 2d at 808.

Appellant's reliance on *Estelle* v. *Smith* (1981), 451 U.S. 454, is misplaced. There, the defendant submitted to a court-ordered pretrial psychiatric examination to determine his competency to stand trial for a capital offense. Over defense objection, the psychiatrist was later permitted to testify during the penalty phase concerning this examination and his conclusions, even though the psychiatrist's name did not appear on the prosecution's witness list. The United States Supreme Court vacated the sentence of death, holding that the admission of this testimony violated the defendant's Fifth Amendment privilege against compelled self-incrimination, since defendant was not advised before the psychiatric examination that he had a right to remain silent and that any statement he made could be used against him at a capital sentencing proceeding. *Id.* at 461-469. In so holding, the court emphasized that the examination was conducted in a custodial setting, under the coercion of a court order, without notice to the defendant that the information extracted from him could later be used to secure the death penalty. *Id.* at 467. This scenario is readily distinguishable from the instant case. Here, the interview by the probation officer was instigated *at appellant's request.* Unlike in *Estelle,* appellant's counsel had every reason to know that the resulting presentence report would be revealed to the jury, since R.C. 2929.03(D)(1) so requires. The interview of appellant, and his responses to the probation officer, were free of any of the coercive aspects so central to the court's analysis in *Estelle.* This court is persuaded that the considerations which compelled the holding in *Estelle* are absent in this case.

Appellant's nineteenth and twentieth propositions of law contend that the death penalty in this case is disproportionately severe compared to penalties imposed in similar cases in the same county and that proportionality review must encompass not only cases where the death penalty was sought, but cases where it could have been, but was not. We reject both arguments.

R.C. 2929.05(A) provides, in pertinent part:

"* * * The court of appeals and the supreme court shall review the judgment in the case and the sentence of death imposed by the court or panel of three judges in the same manner that they review other criminal cases, except that they shall review and independently weigh all of the facts and other evidence disclosed in the record in the case and consider the offense and the offender to determine * * * whether the sentence of death is appropriate. In determining whether the sentence of death is appropriate, the court of appeals and the supreme court shall consider whether the sentence is excessive or disproportionate to the penalty imposed in similar cases. * * * The court of appeals or the supreme court shall affirm a sentence of death only if the particular court is persuaded from the record * * * that the sentence of death is the appropriate sentence in the case."

This court has held that "R.C. 2929.05 requires the review of the pro-

portionality of death sentences regardless of whether counsel has provided evidence of disproportionality." *Jenkins, supra,* at paragraph seven of the syllabus. We have also held that "[t]he proportionality review required of the court of appeals pursuant to R.C. 2929.05(A) need not include criminal cases outside its geographical jurisdiction." *Rogers, supra* (17 Ohio St. 3d 174), at paragraph nine of the syllabus.

Appellant urges that the court of appeals is required to consider not only cases where the death penalty was imposed, but cases where the death sentence could have been sought, but was not. This court has previously rejected this argument. "* * * R.C. 2929.05 does not require a comparison of sentences in non-capital murder cases for proportionality review, nor is a similar requirement imposed by the United States Constitution." *Jenkins, supra,* at 209, 15 OBR at 350, 473 N.E. 2d at 304.

We take this opportunity to clarify the procedures which must be followed by this court and the court of appeals in conducting the statutorily required proportionality review. The statute itself does not describe the scope of this review. Since proportionality review is not constitutionally mandated, *Pulley* v. *Harris* (1984), 465 U.S. 37, this court is relatively free, within the confines of the statute, to determine the pool of cases to be used for comparison. *Rogers, supra* (17 Ohio St. 3d 174), at 186, 17 OBR at 425, 478 N.E. 2d at 996.

The purpose of proportionality review is to determine whether the penalty of death is unacceptable in the case under review because it is disproportionate to the punishment imposed on others convicted of the same crime. *Pulley, supra,* at 43. For the following reasons, we are persuaded that the proportionality review contemplated by R.C. 2929.05(A) should be limited to cases already decided by the reviewing court in which the death penalty has been imposed.

Logic dictates that only those cases which result in a conviction have any use in proportionality review, since only then will a penalty result with which the death sentence under review may be compared. It is equally logical that only convictions of a capital crime are relevant for comparison purposes, since such cases are necessarily so qualitatively different from all others that comparison with non-capital offenses would be a profitless exercise. In fact, R.C. 2929.05(A), in requiring proportionality review, limits the scope of such review to "similar" cases. We are further persuaded that a court cannot make a meaningful proportionality review unless the pool of cases is restricted to those which the reviewing court has itself decided. Comparison with cases not passed upon by the reviewing court would be unrealistic since the reviewing court could not possess the requisite familiarity with the particular circumstances of such cases so essential to a determination of appropriateness. See *Rogers, supra* (17 Ohio St. 3d 174), at 186, 17 OBR at 425, 478 N.E. 2d at 996.

We hold, therefore, that the proportionality review required by R.C. 2929.05(A) is satisfied by a review of those cases already decided by the

reviewing court in which the death penalty has been imposed. Thus, a court of appeals need only compare the case before it with other cases actually passed on by that court to determine whether the death sentence is excessive or disproportionate. Similarly, proportionality review in this court will be limited to a review of cases we have already announced. No reviewing court need consider any case where the death penalty was sought but not obtained or where the death sentence could have been sought but was not.

Turning now to the instant case, we find that, compared with the death penalty cases decided by this court, the sentence herein is not excessive or disproportionate. The penalty of death has previously been imposed in cases involving rape-murder and the sentences have been upheld as appropriate. *Rogers, supra* (17 Ohio St. 3d 174); *State* v. *Maurer* (1984), 15 Ohio St. 3d 239, 15 OBR 379, 473 N.E. 2d 768. The death penalty was upheld in *State* v. *Williams* (1986), 23 Ohio St. 3d 16, 23 OBR 13, 490 N.E. 2d 906, where the victim was a seventy-six-year-old woman, beaten and shot to death in her home in the course of an aggravated robbery. These cases are similar to the instant cause in that each involved terrorizing and even torturing the victim by beatings and/or sexual assault before viciously murdering her. We find that the death penalty in the case *sub judice* is not inappropriate as either excessive or disproportionate given its appalling facts and its similarity to other cases resulting in a sentence of death.

In his twenty-first proposition of law, appellant argues that his right to equal protection was violated by virtue of the fact that the death penalty is almost uniformly imposed on those who kill whites while those who kill blacks are usually spared. The United States Supreme Court has rejected an identical argument in the recent case of *McCleskey* v. *Kemp* (1987), 481 U.S. ____, 95 L. Ed. 2d 262. In *McCleskey,* the defendant, a black, was convicted in Georgia of killing a white police officer and was sentenced to death. The defendant claimed that the Georgia capital sentencing process was administered in a racially discriminatory manner in violation of the Eighth and Fourteenth Amendments. In support of this argument, defendant proffered a statistical study purportedly showing a disparity in the imposition of the death penalty, such that black defendants who kill white victims face a greater likelihood of receiving the death penalty, as compared to white killers of either black or white victims.

The court rejected defendant's argument, holding that mere statistics do not establish that the administration of capital punishment in Georgia violates equal protection. To sustain his claim, defendant must show that racial considerations affected the sentencing process *in his case. Id.* at ____, 95 L. Ed. 2d at 278. The court acknowledged that it has accepted statistics as proof of discriminatory purpose in other scenarios, such as employment and jury selection. However, the criminal law is fundamentally different. Discretion is essential to the functioning of the criminal justice system. Thus, exceptionally clear proof is required before an abuse

of that discretion will be presumed. *Id.* at ____, 95 L. Ed. 2d at 281. Apparent discrepancies are inevitable in the criminal justice system. The Constitution is satisfied where sufficient safeguards exist to prevent arbitrary and capricious imposition of the death penalty.

Appellant herein has offered absolutely no evidence that improper racial considerations prompted the jury's recommendation of death in this case. Without any evidence that racial bias affected the sentencing process *in his case,* appellant's claim of violation of his right to equal protection must fail.

Appellant's twenty-second proposition of law contends that the trial court erred to his prejudice by instructing the jury in the penalty phase to disregard feelings of sympathy in their deliberations. This court has previously rejected this argument, and we adhere to that position today. *Jenkins, supra,* at paragraph three of the syllabus; *State* v. *Scott* (1986), 26 Ohio St. 3d 92, 108, 26 OBR 79, 93, 497 N.E. 2d 55, 68. Our conclusion that such an instruction does not constitute error is buttressed by the recent decision of the United States Supreme Court in *California* v. *Brown* (1987), 479 U.S. ____, 93 L. Ed. 2d 934. In *Brown,* the court upheld an instruction, given during the penalty phase of a capital trial, cautioning the jury to disregard " 'mere sentiment, conjecture, sympathy, passion, prejudice, public opinion or public feeling.' " *Id.* at ____, 93 L. Ed. 2d at 939. In so holding, the court rejected the contention that such an instruction impermissibly prevents the jury from giving due consideration to mitigating factors raised by the defendant. The court looked at the instruction as a whole, and determined that no reasonable juror would extract the word "sympathy" from the litany of factors and regard it as a license to ignore defendant's evidence in mitigation. Rather, a reasonable juror would interpret the term from its context as forbidding reliance on *mere* sympathy, *i.e.,* extraneous emotional factors. *Id.* at ____, 93 L. Ed. 2d at 940-941. The instruction was not error.

Appellant's twenty-third proposition of law, comprising subparts (A) through (G), attacks from various angles the constitutionality of the statutory scheme for the imposition of the death penalty in Ohio. A review of appellant's argument reveals that all aspects thereof have previously been rejected by this court. The contentions that the statutory death penalty scheme serves no rational state interest, that it is impermissibly quasi-mandatory, that it impermissibly prevents juries from extending mercy, that it provides too little guidance to the sentencing authority, and that it fails to narrow the class of death-eligible offenders, were all rejected by this court in *Jenkins, supra.* The argument that the death penalty is inflicted disproportionately on those who kill whites as opposed to those who kill blacks has already been disposed of *supra.* Finally, the proposition that Crim. R. 11(C)(3) improperly encourages guilty pleas to avoid the death penalty in violation of *United States* v. *Jackson* (1968), 390 U.S.

570, has been rejected by this court in *Buell, supra,* at 138, 22 OBR at 215, 489 N.E. 2d at 808.

Our final task today is to undertake the independent weighing process required by R.C. 2929.05(A)[15] to determine whether the aggravating circumstances the offender was found guilty of committing outweigh the mitigating factors in the case.

The aggravating circumstances found to exist in this case consist of rape and aggravated burglary.

Appellant presented two witnesses[16] in the penalty phase of this proceeding as well as two psychiatric reports, a poem written by appellant and a letter also composed by him. Appellant addressed the jury in a very brief unsworn statement expressing his remorse.

The first defense witness was the probation officer who prepared the presentence report. He testified that his report had been hurriedly prepared in one day instead of the usual ten, that he did not know of the defense contention that appellant was mentally ill, and that appellant was cooperative in the interview. The second defense witness was appellant's sister. She testified about appellant's troubled childhood in which he suffered from excessive, often brutal discipline administered by his stepfather in whose eyes appellant could never do anything right. She further testified that appellant was sent away to a Catholic school for troubled children, that he became involved in a church youth group, that he had normal relationships with women, that he was very protective of her, that he wrote poetry, and that he is a "wonderful person." Many of these matters were treated in greater detail in the psychological reports submitted by Drs. Fisher and Schmidtgoessling.

Dr. Fisher's report describes appellant's background in some detail, including the sadistic discipline, appellant's frequent running away from whatever placement he was in, and his petty crimes as a child escalating into more serious offenses as he grew older. Dr. Fisher's conclusion, entitled "Factors in Mitigation of Punishment," is enlightening:

"As noted above, the history I have obtained certainly indicates an ex-

---

[15] R.C. 2929.05(A) states in pertinent part:

"Whenever sentence of death is imposed pursuant to sections 2929.03 and 2929.04 of the Revised Code, the court of appeals and the supreme court shall upon appeal review the sentence of death at the same time that they review the other issues in the case. The court of appeals and the supreme court shall review the judgment in the case and the sentence of death imposed by the court or panel of three judges in the same manner that they review other criminal cases, except that they shall review and independently weigh all of the facts and other evidence disclosed in the record in the case and consider the offense and the offender to determine whether the aggravating circumstances the offender was found guilty of committing outweigh the mitigating factors in the case * * *."

[16] Appellant attempted to introduce the testimony of a third witness, Claude Crowe, the assistant prosecuting attorney trying this case. The request for his testimony was later withdrawn.

tremely unfortunate, highly negative childhood. However it must be noted that other children from this same household were able to survive and become well-adjusted, stable adults. Mr. Steffen's brother, Paul, indicated to me over the telephone that it was his belief (and that of much of the rest of his family as well) that his brother David seemed to crave negative attention and to do everything within his power at all times to seek it. In any event, I believe that Mr. Steffen is free from any significant disease or defect of his mind. The personality structure which characterizes him is a maladaptive, self-defeating one, but does not, in my opinion, constitute mental illness as it is recognized either within the profession of psychology or by the law of this state. Furthermore, it is my opinion that at the time of the criminal acts of which he has been convicted, Mr. Steffen possessed the capacity to appreciate the criminality of his conduct and to conform his conduct to the requirements of the law. The screams which he reports having the effect of 'explosions' in his mind certainly panicked and provoked him. However, it is my opinion that this provocation was similar in magnitude and nature to that which he had experienced at other times in his life when he had been seen as acting impulsively and recklessly. The evidence does not suggest that a mental illness was precipitated at any of those times or in the current offense."

Dr. Schmidtgoessling's report also reviewed appellant's childhood and background. She concluded that "[h]is behavior at the time of the offense, specifically his loss of rational control, is typical of a personality disorder but is not the product of a mental disease or defect." She further stated that any "marked improvement in behavior is unlikely."

A letter written by appellant to his victim's parents was admitted into evidence. The letter expressed his regrets at having committed the offense and his sympathy for the grief that they had to bear as a consequence. However, Dr. Schmidtgoessling remarked in her report that appellant showed no remorse for his offense and no sympathy for his victim or her family.

R.C. 2929.04(B) provides that, in weighing the mitigating factors, the sentencing authority "shall consider, and weigh against the aggravating circumstances proved beyond a reasonable doubt, the nature and circumstances of the offense, the history, character, and background of the offender, and all of the following factors:

"(1) Whether the victim of the offense induced or facilitated it;

"(2) Whether it is unlikely that the offense would have been committed, but for the fact that the offender was under duress, coercion, or strong provocation;

"(3) Whether, at the time of committing the offense, the offender, because of a mental disease or defect, lacked substantial capacity to appreciate the criminality of his conduct or to conform his conduct to the requirements of the law;

"(4) The youth of the offender;

"(5) The offender's lack of a significant history of prior criminal convictions and delinquency adjudications;

"(6) If the offender was a participant in the offense but not the principal offender, the degree of the offender's participation in the offense and the degree of the offender's participation in the acts that led to the death of the victim;

"(7) Any other factors that are relevant to the issue of whether the offender should be sentenced to death."

We find that, of the above-enumerated factors, numbers (1), (2), (3) and (6) do not exist under these facts. Number (4) is not compelling, as appellant was twenty-two years old at the time, substantially beyond the age of majority, and the evidence demonstrated that appellant was sufficiently mature to appreciate the consequences of his conduct.[17] As to factor number (5), appellant's past history of criminal convictions or delinquency adjudications cannot be characterized as insignificant. He had been convicted in 1977 of robbery and was sentenced to one to ten years' imprisonment. In 1979, he escaped from the reformatory and served one year in an Indiana State Prison. His juvenile offenses date back to 1972 and include arson, shoplifting, illegal entry, theft, burglary, larceny, escape, malicious trespass, carrying a concealed weapon and possession of marijuana. This statutory mitigating factor is entitled to little, if any, weight.

With regard to factor number (7), we have considered all the evidence of appellant's unfortunate childhood, his apparent lack of positive role models, and his attempts to straighten himself out through church youth group activities. Our view of the totality of the evidence compels us to conclude that these combined factors, if in fact these factors are mitigating,[18] are insufficient to outweigh the aggravating circumstances of rape and aggravated burglary.

Nor does our consideration of "the nature and circumstances of the offense, the history, character, and background of the offender" alter this conclusion. The nature and circumstances of this offense are so harrowing that no mitigating feature can possibly be imagined. The history, character and background of the offender have already been explored, *supra*, with no mitigating factors found sufficient to outweigh the aggravating circumstances. The mitigating factors are deemed insufficient on the basis that the evidence demonstrates that appellant's traumatic personal history did not substantially impair his capacity to appreciate the wrongfulness of his conduct or to control his actions. Dr. Fisher so concluded in his report. All four psychiatric experts who testified in the guilt

---

[17] In fact, Dr. Fisher's report characterized appellant as "very intelligent."

[18] Black's Law Dictionary (5 Ed. 1979) 903, defines "mitigating circumstances" as those which "do not constitute a justification or excuse of the offense in question, but which, in fairness and mercy, may be considered as extenuating or reducing the degree of moral culpability. * * *"

phase of this proceeding agreed that appellant was not incapable of distinguishing right from wrong. Appellant's siblings were raised in the same abusive environment and yet were able to mature into well-adjusted, functioning adults. While we are sympathetic towards appellant's obviously lamentable past, we must conclude that the mitigating factors are inadequate to outweigh the aggravating circumstances in this case.

We would remark at this juncture that while R.C. 2929.04(B)(7) evinces the legislature's intent that a defendant in a capital case be given wide latitude to introduce any evidence the defendant considers to be mitigating, this does not mean that the court is necessarily required to accept as mitigating everything offered by the defendant and admitted. The fact that an item of evidence is admissible under R.C. 2929.04(B)(7) does not automatically mean that it must be given any weight. For example, a defendant may introduce the testimony of his high school English teacher to the effect that defendant behaved well and was always prepared. However, the jury, or the court in its own independent weighing process, may properly choose to assign absolutely no weight to this evidence if it considers it to be non-mitigating. Only that evidence which lessens the moral culpability of the offender or diminishes the appropriateness of death as the penalty can truly be considered mitigating. Evidence which is not mitigating is not entitled to any weight as a mitigating factor in determining whether such factors outweigh the aggravating circumstances.

In conclusion, we uphold appellant's convictions and sentence of death. We are persuaded from the record that appellant was accorded a fair trial and a thorough, impartial review by the court of appeals. We are convinced that the death penalty is an appropriate sanction under these facts.

Accordingly, the judgment of the court of appeals is hereby affirmed.

*Judgment affirmed.*

MOYER, C.J., SWEENEY, LOCHER and H. BROWN, JJ., concur.

HOLMES and WRIGHT, JJ., concur in judgment only.