OPINION
In August 1998, Michael E. Clark was indicted by a Franklin County grand jury on single counts each of aggravated robbery, robbery, aggravated burglary and burglary. In addition, the greater offenses of aggravated robbery and aggravated burglary carried firearm specifications. The charges arose as a result of a May 13, 1998 incident during which a masked man purportedly robbed Dawn Cochran at gunpoint. The incident occurred at the rental office of the apartment complex where Ms. Cochran was working. Approximately one year prior to the incident, Mr. Clark had been employed briefly as a groundskeeper at the same complex. Additional pertinent details are discussed below.
A jury trial commenced in November 1998. The jury ultimately convicted Mr. Clark of all counts and specifications.
A sentencing hearing was held on December 4, 1998. After merging the lesser-included offenses of robbery and burglary into the greater offenses, Mr. Clark was sentenced to concurrent prison terms of nine years each for the aggravated robbery and aggravated burglary convictions. After merging the firearm specifications, the trial court ordered an additional prison term of three years. The convictions and sentences were journalized pursuant to an entry filed December 8, 1998.
Michael E. Clark (hereinafter "appellant") has timely appealed, assigning four errors for our consideration:
FIRST ASSIGNMENT OF ERROR
 There was insufficient evidence to support a finding that appellant possessed a firearm as defined in R.C. 2923.11.
 SECOND ASSIGNMENT OF ERROR
 There was insufficient evidence to establish guilt by proof beyond a reasonable doubt on the counts of aggravated burglary and burglary.
 THIRD ASSIGNMENT OF ERROR
 There was insufficient evidence to establish guilt by proof beyond a reasonable doubt on the counts of aggravated robbery and robbery.
 FOURTH ASSIGNMENT OF ERROR
 The verdict of the jury was against the manifest weight of the evidence.
Preliminarily, we set forth the similar, yet distinct, standards by which we are bound in reviewing the respective assignments of error. Assignments of error one through three challenge the sufficiency of the evidence, while the fourth attacks the manifest weight of the evidence.
"The legal concepts of sufficiency of the evidence and weight of the evidence are both quantitatively and qualitatively different." State v. Thompkins (1997), 78 Ohio St.3d 380, paragraph two of the syllabus. In Thompkins, the court explained at length the distinctions between the two standards:
 With respect to sufficiency of the evidence, "sufficiency" is a term of art meaning that legal standard which is applied to determine whether the case may go to the jury or whether the evidence is legally sufficient to support the jury verdict as a matter of law.' Black's Law Dictionary (6 Ed. 1990) 1433. See, also, Crim.R. 29(A) (motion for judgment of acquittal can be granted by the trial court if the evidence is insufficient to sustain a conviction). In essence, sufficiency is a test of adequacy. Whether the evidence is legally sufficient to sustain a verdict is a question of law. State v. Robinson (1955), 162 Ohio St. 486 * * *. In addition, a conviction based on legally insufficient evidence constitutes a denial of due process. Tibbs v. Florida (1982), 457 U.S. 31, 45, * * * citing Jackson v. Virginia
(1979), 443 U.S. 307 * * *.
When reviewing the sufficiency of the evidence to support a conviction, an appellate court must review the record to determine "whether the evidence, if believed, would convince the average mind of the defendant's guilt beyond a reasonable doubt." Statev. Jenks (1991), 61 Ohio St.3d 259, paragraph two of the syllabus. In Jenks, the Supreme Court set forth the stringent standard of to be applied in a sufficiency analysis:
 "The relevant inquiry is whether, after viewing the evidence in a light most favorable to the prosecution, any rational trier of fact could have found the essential elements of the crime proven beyond a reasonable doubt." Id.
In contrast, as explained in Thompkins, supra, and applied in appellant's fourth assignment of error, a manifest weight analysis is slightly different:
 Although a court of appeals may determine that a judgment of a trial court is sustained by sufficient evidence, that court may nevertheless conclude that the judgment is against the weight of the evidence. Robinson, supra, 162 Ohio St. at 487 * * *. Weight of the evidence concerns `the inclination of the greater amount of credible evidence,
offered in a trial, to support one side of the issue rather than the other. It indicates clearly to the jury that the party having the burden of proof will be entitled to their verdict, if, on weighing the evidence in their minds, they shall find the greater amount of credible evidence sustains the issue which is to be established before them. Weight is not a question of mathematics, but depends on its effect in inducing belief.' (Emphasis added.) Black's, supra, at 1594.
 When a court of appeals reverses a judgment of a trial court on the basis that the verdict is against the manifest weight of the evidence, the appellate court sits as a "`thirteenth juror'" and disagrees with the factfinder's resolution of the conflicting testimony. Tibbs, 457 U.S. at 42 * * *. See, also, State v. Martin (1983), 20 Ohio App.3d 172, 175 * * * (`The court, reviewing the entire record, weighs the evidence and all reasonable inferences, considers the credibility of witnesses and determines whether in resolving conflicts in the evidence, the jury clearly lost its way and created such a manifest miscarriage of justice that the conviction must be reversed and a new trial ordered. The discretionary power to grant a new trial should be exercised only in the exceptional case in which the evidence weighs heavily against the conviction.').
Pursuant to the foregoing standards, we examine the record in a light most favorable to the prosecution to determine if the prosecution sufficiently proved beyond a reasonable doubt each element of the offenses charged, and/or whether the jury "lost its way" in convicting appellant such that a manifest miscarriage of justice occurred.
Turning to the evidence adduced at trial, the parties concur with the following summary of the facts.
Dawn Cochran testified that on May 13, 1998, the day of the incident, she was employed as the rental manager of an apartment complex, the Tivoli Apartments. Her office was located on the first floor of a one-bedroom unit, which had been completely converted into an office, with no one residing there. This unit was located at the front entrance to the apartment complex. The office was open for business, as posted on a sign, between 10:00 a.m. and 6:00 p.m. Ms. Cochran supervised various employees, including a maintenance man, a groundskeeper, and an assistant who worked on Saturdays.
According to Ms. Cochran, May 13, 1998 was a busy day. She had numerous appointments scheduled, in addition to several persons who came into the office wanting to see an apartment. At approximately 1:00 p.m., Ms. Cochran was at her desk entering late rent payments into the computer. She was also working on eviction notices to delinquent renters, which she did regularly between the thirteenth and fifteenth of each month. Ms. Cochran had in her possession $60 to $70 in cash.
Ms. Cochran was facing away from the door entrance into her office, when she heard the door open and a man yelling, "[g]ive me the cash." She turned and saw a man wearing a shear white nylon mask. She believed it was made of pantyhose, with small slits cut out for the eyes and mouth. According to Ms. Cochran, the mask was dirty and distorted the man's face by "smushing" it up. However, she testified that she was able to discern enough features through the mask to support her ultimate conclusion that the man was appellant. While her visual identification was less than positive, she was "positively" sure that the man was appellant by identifying his voice, with which she claimed to be very familiar.
The masked man was carrying what Ms. Cochran believed was a small silver gun which was covered almost entirely by the man's hand. Ms. Cochran testified that she had never even seen a handgun before that day. In fact, she subsequently told the police that the gun might have been a "toy."
Ms. Cochran described the object she thought was a gun as having a very small hole at the end, with the sides of the gun being square and the top rounded. She saw no bullets. No gun was fired nor were any verbal threats, in reference to the "gun" or otherwise, made by the masked man. She emphasized again that the small object was hidden by the man's hand.
The masked man pointed the gun at Ms. Cochran's chest and repeatedly demanded cash. She gave him the checks, money orders, and the small amount of cash she had. When the man demanded more, she gave him her rings and her purse. The robber turned and ran.
Ms. Cochran remained inside the office and phoned the police, who arrived within minutes. She pointed out the nylon mask, which had been discarded in some nearby bushes. She informed Columbus Police Officer Dan Adair that she believed the man was appellant, a former employee. Ms. Cochran was visibly upset when the officer arrived.
Ms. Cochran approximated the suspect's height as being between 5'8" and 5'10". However, Ms. Cochran did concede that her attention was primarily focused on what she perceived to be a gun, which was so small as to be virtually hidden by the holder's hand, and approximately one foot away from her chest.
The stolen items, none of which were ever connected with appellant, were never recovered. The object Ms. Cochran believed to be a gun was also never found.
Ms. Cochran explained that she had hired appellant as a groundskeeper in mid-April 1997 after interviewing him for twenty to thirty minutes. During the time he worked at the complex, appellant typically spoke with Ms. Cochran about four times daily. She had lunch with him on one occasion; on another, she drove him home after he sprained his ankle.
Ms. Cochran explained that she collected coins from the complex's laundry machines between the twentieth and twenty-fifth of each month. The amount she collected each month averaged between $950 and $1,000. Appellant knew about the routine for collecting this money; appellant even accompanied her on at least one occasion to assist her. He knew the days on which she was likely to collect it and that she returned to her office with it in order to count it and prepare it for deposit. Aside from the one-to-three day period in which she collected the laundry money, Ms. Cochran stated that, at all other times, she typically had no more than $100 or $200 in petty cash, another fact of which appellant was aware.
In mid-June 1997, Ms. Cochran fired appellant because of his absenteeism. After discharging him, she next saw him when he picked up his final paycheck. In July 1997, she saw appellant and his pregnant wife shopping for baby clothes in a Target store. Ms. Cochran approached them and demanded that appellant return a weed-eater and the $100 she had advanced him early in his employment with her. Ms. Cochran was annoyed with appellant, telling him that he was buying a lot of items that day when he claimed that he could not or would not pay her back the money he owed her.
Ms. Cochran acknowledged that she was aware of numerous break-ins and rumors regarding other activities, including an assault on a previous rental manager.
Octavia Clark, appellant's wife, was the only witness called to testify on his behalf. According to Ms. Clark, her husband was employed as the assistant manager at a U-Haul Truck Rental at the time of his arrest. Ms. Clark opined that it is inconceivable that appellant could have used a gun to commit an offense. She explained that he is personally opposed to guns because his mother was killed by a gun. According to Ms. Clark, she and appellant never kept weapons in their home and she never saw him with one. Appellant had indicated during a family discussion that he could never have served in the military because he was opposed to handling guns. According to Ms. Clark, their family was not suffering financially during the time of the robbery.
Turning now to appellant's first assignment of error, appellant contends that the prosecution failed to prove by sufficient evidence the specification that he possessed a firearm, which is defined in R.C. 2923.11(B) as follows:
 (1) "Firearm" means any deadly weapon capable of expelling or propelling one or more projectiles by the action of an explosive or combustible propellant. "Firearm" includes an unloaded firearm, and any firearm that is inoperable but that can readily be rendered operable.
 (2) When determining whether a firearm is capable of expelling or propelling one or more projectiles by the action of an explosive or combustible propellant, the trier of fact may rely upon circumstantial evidence, including, but not limited to, the representations and actions of the individual exercising control over the firearm.
Appellant was indicted on this specification pursuant to R.C. 2941.145(A), which reads, in pertinent part:
 Imposition of a three-year mandatory prison term upon an offender under division (D)(1)(a)(i) of section 2929.14 of the Revised Code is precluded unless the indictment * * * charging the offense specifies that the offender had a firearm on or about the offender's person or under the offender's control while committing the offense and displayed the firearm, brandished the firearm, indicated that the offender possessed the firearm, or used it to facilitate the offense. (Emphasis added.)
In Thompkins, supra, paragraph one of the syllabus, the Supreme Court of Ohio elaborated on the requisite proof to sustain a firearm specification:
 A firearm enhancement specification can be proven beyond a reasonable doubt by circumstantial evidence. In determining whether an individual was in possession of a firearm and whether the firearm was operable or capable of being readily rendered operable at the time of the offense, the trier of fact may consider all relevant facts and circumstances surrounding the crime, which include any implicit threat made by the individual in control of the firearm. (State v. Murphy [1990], 49 Ohio St.3d 206, * * * State v. Jenks [1991], 61 Ohio St.3d 259, * * * and State v. Dixon
[1995], 71 Ohio St.3d 608, * * * followed; R.C. 2923.11[B][1] and [2], construed and applied.) (Emphasis added.)
As emphasized in Thompkins, the prosecution bears the burden of proving not only that an offender had a firearm in his or her possession, but additionally that the gun was operable or readily made operable.
Given the state of this record, we cannot conclude that the prosecution sufficiently proved the firearm specification beyond a reasonable doubt, either directly or by circumstantial evidence. The evidence presented was insufficient to sustain a finding that appellant even possessed a firearm, much less its "operability," within the meaning of R.C. 2941.145 above. The record simply does not support a finding that appellant displayed, brandished or used what is defined as a firearm to facilitate the robbery.
The only evidence to support the possible existence of a firearm at the robbery scene was presented via the testimony of Ms. Cochran. Her testimony regarding the object in question cannot be construed to constitute sufficient evidence of a firearm. As noted above, Ms. Cochran acknowledged that her initial statement to police included her opinion that the object she saw "might be a toy."
In State v. Butler (Sept. 13, 1994), Franklin App. No. 94APA01-75, unreported (1994 Opinions 4169, 4178), this court reversed the firearm specification enhancing an aggravated robbery conviction based upon evidence significantly more persuasive than that present in the instant case:
 In the present case, the only testimony regarding operability was that of the victims. Armstrong testified that defendant approached the counter and demanded money from the register while a second man pointed a gun at her. Armstrong admitted that no threats were uttered by either the defendant or his accomplice. Armstrong described the gun as a small, old looking revolver with the end scraped; she stated that there was no doubt in her mind that the gun was real. Brooks testified that she saw the second man holding the gun on Armstrong in a threatening manner; that the gun appeared to be a real gun and she treated it as a real gun. There is no indication in the record that Armstrong or Brooks had any experience with firearms.
Pursuant to Thompkins, supra, a factfinder may consider "any implicit threat made by the individual in control of the firearm" in determining both possession of a firearm and its operability. Id., paragraph one of the syllabus. However, theThompkins syllabus does not suggest that either possession or operability may be proven, beyond a reasonable doubt, basedexclusively upon the victim's subjective perception of such a threat.
The first assignment of error is sustained.
In his second assignment of error, appellant argues that the evidence was insufficient to prove beyond a reasonable doubt both aggravated burglary and burglary.
The elements of "burglary," as pertinent here, are set forth in R.C. 2911.12 as follows:
 (A) No person, by force, stealth, or deception, shall do any of the following:
 (1) Trespass in an occupied structure or in a separately secured or separately occupied portion of an occupied structure, when another person other than an accomplice of the offender is present, with purpose to commit in the structure or in the separately secured or separately occupied portion of the structure any criminal offense[.] (Emphasis added.)
The elements of "aggravated burglary" are set forth in R.C. 2911.11(A):
 No person, by force, stealth, or deception, shall trespass in an occupied structure or in a separately secured or separately occupied portion of an occupied structure, when another person other than an accomplice of the offender is present, with purpose to commit in the structure or in the separately secured or separately occupied portion of the structure any criminal offense, if any of the following apply:
 (1) The offender inflicts, or attempts or threatens to inflict physical harm on another;
 (2) The offender has a deadly weapon or dangerous ordnance on or about the offender's person or under the offender's control.
Both burglary and aggravated burglary require, as threshold elements, proof beyond a reasonable doubt of both a "trespass" and an "occupied structure."
"Criminal trespass," as defined in R.C. 2911.21(A), prohibits a person, "without privilege to do so," from doing any of the following:
 (1) Knowingly enter or remain on the land or premises of another;
 (2) Knowingly enter or remain on the land or premises of another, the use of which is lawfully restricted to certain persons, purposes, modes, or hours, when the offender knows he is in violation of any such restriction or is reckless in that regard;
 (3) Recklessly enter or remain on the land or premises of another, as to which notice against unauthorized access or presence is given by actual communication to the offender, or in a manner prescribed by law, or by posting in a manner reasonably calculated to come to the attention of potential intruders, or by fencing or other enclosure manifestly designed to restrict access;
 (4) Being on the land or premises of another, negligently fail or refuse to leave upon being notified to do so by the owner or occupant, or the agent or servant of either.
"Privilege," as relevant here, "means an immunity,license, or right conferred by law, bestowed by express orimplied grant * * *." (Emphasis added.) R.C. 2901.01(A)(12).
"Occupied structure" includes in its definition "any house, building * * * or any portion thereof" when "[a]t the time, any person is present or likely to be present in it." R.C.2909.01(C)(4).
While the record supports a finding that the rental office in which Ms. Cochran was working qualifies as an "occupied structure," there is insufficient evidence that appellant committed criminal trespass. As stated by the Supreme Court of Ohio in State v. Barksdale (1983), 2 Ohio St.3d 126, 127, "* * * the commission of a `trespass' is a sine qua non" of such offenses as aggravated burglary.
As appellant notes, in Barksdale, the Supreme Court of Ohio held, at the syllabus, for purposes of the offense of breaking and entering (a "less severe form of burglary"), "a business invitee or licensee, who commits a felony while present on another's land or premises, does not thereby become a trespasser." (Emphasis added.)
The prosecution failed to establish the crucial basis of a trespass by failing to prove that appellant was in the rental office "without privilege to do so." As the Barksdale language above indicates, such a "privilege" generally exists when a business establishment is "open to the public." Nothing in the record before us suggests to the contrary. In fact, on direct examination, Ms. Cochran explained a typical traffic pattern in the office (except during the first week of the month when rent is due) during its typical hours of 10:00 a.m. to 6:00 p.m.:
 Well, it certainly does * * * slow down because if anyone — often times like a resident, if they had a complaint about something or wanted to talk to me, they would just come in and talk to me while they were paying their rent. So like the last five days of the month — the first five days of the month are very busy. I have a lot of people in and out, things like that. * * *
 The only time — typically a resident would not be coming in unless they would have to sign a lease, or something out of the ordinary. I would — the only people that might come in would be prospects, or clients that are interested in looking at an apartment, or a vendor, * * * like a carpet cleaner, or someone that's moving in. (Tr. 103.) (Emphasis added.)
Ms. Cochran's testimony is replete with characterizations of potential renters as "walk-ins," those just dropping by her office without an appointment.
The transcript reveals the prosecution's suggestion to its witness, Ms. Cochran, that the rental office might be difficult for someone who is unfamiliar with the complex to find. Ms. Cochran's testimony in this regard was quite to the contrary.
On cross-examination, Ms. Cochran indicated that there is a "very visible[,] * * * big sign" reading "Tivoli Apartments" at the front of the office building facing the street. The rental office was marked by a separate sign with an arrow directing potential renters, and/or those wishing to tour a model apartment, to the rental office. The sign was visible to vehicles and passers-by, "walk-ins," on the street. According to Ms. Cochran, the signs are "extremely important" for business reasons.
The prosecution attempts to distinguish this case fromBarksdale, supra, by reliance upon State v. Steffen (1987),31 Ohio St.3d 111, which involved, inter alia, an aggravated burglary. Steffen contended that the trial court erred in instructing the jury that a person who "lawfully enters premises becomes a trespasser subject to conviction for burglary by virtue of the commission of a felony on the premises." Relying uponBarksdale, supra, Steffen contended that once he had been granted the privilege to enter, the privilege "is not vitiated by the subsequent commission of a felony thereon." Id. at 114. TheSteffen court readily distinguished its facts from those presented in Barksdale. One glaringly significant distinction is that the murder and other offenses in Steffen were committed in a private residence; in stark contrast, Barksdale involved a used car lot open to the public.
"The interest of a private person in the inviolability of his home is materially greater than that of a business owner in his business premises, particularly where the business premisesare open to the public." Steffen at 115. (Emphasis added.) Since analogous distinguishing facts are present here, the prosecution's reliance upon Steffen is misplaced.
Aggravated burglary and burglary of "occupied structures" are legislatively serious felonies based upon an obvious, common-sense recognition of the inherent potential danger to persons who are or might be present in the presumed safety and privacy of their own homes. Carrying this rationale to its logical conclusion, crimes committed in "unoccupied structures" or businesses "open to the public" are statutorily lesser offenses.
The state having failed to prove that appellant committed trespass, the second assignment of error is sustained.
In his third assignment of error, appellant argues that evidence also failed to establish the elements of aggravated robbery and robbery. We agree with the former but not the latter.
"Aggravated robbery" is prohibited by R.C. 2911.01(A), in pertinent part, as follows:
 No person, in attempting or committing a theft offense * * *, or in fleeing immediately after the attempt or offense, shall do any of the following:
 (1) Have a deadly weapon on or about the offender's person or under the offender's control and either display the weapon, brandish it, indicate that the offender possesses it, or use it;
* * *
 (3) Inflict, or attempt to inflict, serious physical harm on another.
 "Robbery" is proscribed by R.C. 2911.02(A) as follows:
 No person, in attempting or committing a theft offense or in fleeing immediately after the attempt or offense, shall do any of the following:
 (1) Have a deadly weapon on or about the offender's person or under the offender's control;
 (2) Inflict, attempt to inflict, or threaten to inflict physical harm on another.
Given our disposition of the firearm specification in the first assignment of error, we cannot find evidence in this record which supports an aggravated robbery conviction where the aggravating element is not only possession of a deadly weapon but also displaying or "brandishing" it. Nor can we find any proof whatsoever of the aggravating element of inflicting or attempting to inflict "serious physical harm" to the victim. Pursuant to R.C. 2901.01(A)(5), "serious physical harm to persons" means any of the following:
 (a) Any mental illness or condition of such gravity as would normally required hospitalization or prolonged psychiatric treatment;
 (b) Any physical harm that carries a substantial risk of death;
 (c) Any physical harm that involves some permanent incapacity, whether partial or total, or that involves some temporary, substantial incapacity;
 (d) Any physical harm that involves some permanent disfigurement, or that involves some temporary, serious disfigurement;
 (e) Any physical harm that involves acute pain of such duration as to result in substantial suffering, or that involves any degree of prolonged or intractable pain.
Since there exists no proof of either possession of a deadly weapon or an attempt to cause serious physical harm, the prosecution failed to present sufficient evidence to sustain a conviction for aggravated robbery.
Notwithstanding the foregoing, we do find that the evidence sufficiently supports a conviction for robbery. To prove robbery, the prosecution must establish beyond a reasonable doubt that the offender either had a "deadly weapon" in his possession or, alternatively, that he inflicted or attempted to inflict "physical harm" on another. Pursuant to R.C. 2901.01, "physical harm" means "any injury, illness, or other physiological impairment, regardless of its gravity or duration." (Emphasis added.)
The finder of fact could reasonably determine that appellant inflicted or implicitly threatened to inflict "physical harm" (as opposed to aggravated robbery's "serious" physical harm element) on Ms. Cochran. The record readily establishes that Ms. Cochran suffered, not surprisingly, at least some degree of psychological impairment as a result of the incident.
To the extent that we find the evidence insufficient to support an aggravated robbery conviction, the third assignment of error is sustained. Because we find the evidence sufficient to support robbery, the third assignment of error is overruled in part.
The fourth assignment of error contends that appellant's convictions were against the manifest weight of the evidence. Because we have found the evidence to be insufficient to sustain his convictions for aggravated burglary, burglary and aggravated robbery, as well as the firearm specifications attached thereto, those convictions are also necessarily against the manifest weight of the evidence. To this extent, the fourth assignment of error is sustained in part.
For the reasons indicated above, appellant's robbery conviction was not against the manifest weight of the evidence. The record simply fails to demonstrate that the jury "lost its way" in finding that appellant caused Ms. Cochran some physical harm, regardless of the duration of such duress, as a result of the incident.
The fourth assignment of error is sustained in part and overruled in part. We sustain that portion which argues that the convictions for aggravated burglary, burglary and aggravated robbery, including the firearm specifications, are against the manifest weight of the evidence. However, we overrule that portion which contends that appellant's robbery conviction is against the manifest weight of the evidence.
In summary, appellant's first and second assignments of error are sustained. The third and fourth assignments of error are sustained in part and overruled in part.
Based upon the foregoing, this cause is affirmed in part and reversed in part and this cause is remanded for further proceedings consistent with this opinion.
Judgment affirmed in part and reversed in part and causeremanded.
PETREE and DESHLER, JJ., concur.