OPINION
Defendant-appellant Arthur Swanson appeals his conviction from the Ashland County Common Pleas Court on one count of robbery in violation of R.C. 2911.02(A)(2), one count of aggravated burglary in violation of R.C. 2911.11(A)(1), and one count of abduction in violation of R.C.2905.02(A)(2). Plaintiff-appellee is the State of Ohio.
 STATEMENT OF THE FACTS AND CASE
On January 4, 1999, the Ashland County Grand Jury indicted appellant on one count of robbery in violation of R.C. 2911.02(A)(2), a felony of the second degree, one count of aggravated burglary in violation of R.C.2911.11(A)(1), a felony of the first degree, and one count of abduction in violation of R.C. 2905.02(A)(2), a felony of the third degree. At his arraignment on January 12, 1999, appellant entered a plea of not guilty to the charges contained in the indictment. Subsequently, a jury trial commenced on September 2, 1999. The following evidence was adduced at trial. At approximately 7:15 a.m. on November 25, 1998, a black man knocked on the washhouse door of Elias Keim's house in Ashland County. The washhouse, which is part of Keim's house, is built against the kitchen. When Keim, an Amish farmer and wood worker, opened the door, the man asked Keim if he had any eggs to sell. Although Keim usually does not sell eggs, he told the man that he would ask his wife, Sara, who was in the kitchen, if they had any extra eggs. After Sara told him that there were some eggs in the washhouse, Keim returned to the washhouse to collect the eggs so that Sara could put them into egg cartons. Upon entering the washhouse, Keim noticed that the man had entered the washhouse. At trial, Keim testified that he had not invited the man into his house or done anything to indicate to the man that he should enter the same. Keim then collected the eggs, returned to the kitchen, and transferred the eggs into egg cartons. Keim testified that when, after returning to the washhouse, he attempted to give the man the eggs, the man "took about two steps forward and put out his left hand pretending he wants to pick up an egg, and the next instance I knew he had his left arm locked around my neck." Trial Transcript at 194. The man, who told Keim that he wanted all of the money in the house, then dragged Keim into the kitchen, causing Keim's wife, Sara, to begin screaming. When Sara attempted to pull the man off of her husband, the man threatened to kill him if Sara didn't back off. After Keim told Sara that the man wanted money, Sara went into the living room of the house, retrieved a billfold, and handed the man all of the bills contained in the billfold, which totaled somewhere between $60.00 and $70.00. Since the man, however, was not satisfied, Sara then gave the man a little desk drawer containing loose change. Appellant then fled the Keims' house, taking the drawer with him. While Keim was unable to recall the man's license plate number, he observed that the man was driving a long, heavy gray car with a shorter rear window. During his testimony, Keim testified that the man was dark skinned, slender and of medium height and that the man had high cheek bones. According to Keim, the man was wearing a black leather-like cap and a black leather-like jacket. Keim, who testified at trial that appellant looked "very much like" the person who had robbed him, also testified that he picked appellant's photograph from a photo array. Trial Transcript at 215. At trial, Keim testified that the jacket and the hat that had been recovered from a search of appellant's residence looked "very much like" the jacket and the hat that the robber had worn. Trial Transcript at 208, 209. Keim also testified that the vehicle in the photographs that had been taken by the Sheriff's Department at appellant's residence looked very similar to the car that the robber was driving. Although Sara Keim, Keim's wife, did not testify at trial, Benny Keim, his sixteen year old son, testified. Benny testified that while he was outside after breakfast on November 25, 1998, he saw a car come up his driveway and park in front of his house. Benny described the car as a "long gray car" with louvers in front of the front door and a back window that "was almost straight up and down instead of slanted." Trial Transcript at 93, 94. As he sat watching the car, Benny observed a black man wearing a black hat and black leather jacket running out of the house door with a small parcel in his hand. A photograph of appellant's vehicle was taken by the Ashland County Sheriff's Department at appellant's residence. At trial, Benny testified that the car in the photograph looked very similar to the car that had been at his house on November 25, 1998. In addition, Benny testified that the hat and jacket that had been recovered during a subsequent search of appellant's residence looked very similar to the hat and jacket that the man had been wearing. After his parents came running out of the house after the robbery, Benny ran to the neighbors house and told the neighbors that they had been robbed. At approximately 8:15 a.m. on November 25, 1998, Detective George Edward Staley of the Ashland County Sheriff's Department was dispatched to the scene of the robbery. After interviewing the Keim family, officers were dispatched to look for "a black male, slender build, short hair, dark complexion, wearing a leather jacket and a dark colored English style riding cap." Trial Transcript at 151. The officers also were directed to look for a large gray luxury vehicle with louvers on the front fenders and a landau roof. The vehicle's license number, according to the information provided to Detective Staley, contained the prefix DXL. Detective Staley testified that a wooden drawer, which was identified at trial by Elias Keim, was located on State Route 545. After receiving an anonymous tip on December 8, 1998, that appellant was involved in the robbery, a detective was sent to appellant's residence to see if there were any vehicles at the residence matching the description of the suspect's vehicle. A photograph was taken of such a vehicle, which belonged to appellant's mother, Mae Owens. The first three letters of the vehicle's license plate were DXL. Owens, who testified at trial that appellant had been driving her car on November 25, 1998, identified a photograph taken by the Sheriff's Department as her car. As a result, a search warrant was obtained and a black leather jacket and black hat were taken from appellant's residence. At trial, Jeffrey Workman testified that he had telephoned in the anonymous tip to the Ashland County Sheriff's Department. Workman, who had worked with appellant, testified that during the summer of 1998, appellant had suggested robbing the Amish. Workman further testified that he contacted the Sheriff's Department after seeing a composite picture in the newspaper resembling appellant. Lonnie Smith, who also had worked with appellant in 1998, testified at trial that appellant had told him that he wanted to rob the Amish since they did not have telephones and would not report a crime. Donald Alan Maxey, a high school auto instructor, also testified on appellee's behalf at trial. Maxey testified that, on November 25, 1998, he was on Charles Road, near the Ashland and Richland County borders, when a person in a silver or gray Chrysler car asked him for directions to an Amish farm. The man told Maxey that he wanted to buy some eggs. Maxey identified the vehicle in the photograph taken by the Sheriff's Department at appellant's residence as such vehicle. In addition, Maxey identified appellant as the man both in a photographic array prior to trial and at trial. Timothy Woods testified at trial on behalf of appellant. Woods initially testified that appellant had come to Woods' house in Mansfield between 8:00 a.m. and 8:30 a.m. on November 25, 1998. However, Woods later agreed that appellant would have had to come to his house either on Thursday, November 26, 1998, or Friday, November 27, 1998, since appellant came to Woods' house on a day that Woods was off from work for the Thanksgiving holiday. At the conclusion of the evidence and the end of deliberations, the jury, on September 3, 1999, returned with guilty verdicts on all counts contained in the indictment. Thereafter, as memorialized in a Judgment Entry filed on October 25, 1999, the trial court sentenced appellant to prison for seven years on the robbery charge, to nine years on the aggravated burglary charge, and to four years on the abduction charge. The trial court further ordered that appellant's sentences be served consecutively. It is from his conviction that appellant now prosecutes his appeal, raising the following assignments of error:
 ASSIGNMENT OF ERROR I APPELLANT'S CONVICTION FOR AGGRAVATED BURGLARY IS AGAINST THE SUFFICIENCY OF THE EVIDENCE IN VIOLATION OF THE FIFTH AND FOURTEENTH AMENDMENTS TO THE FEDERAL AND CONSTITUTION AND SECTION 16, ARTICLE I OF THE OHIO CONSTITUTION.
 ASSIGNMENT OF ERROR II APPELLANT'S CONVICTION FOR AGGRAVATED BURGLARY IS AGAINST THE MANIFEST WEIGHT OF THE EVIDENCE IN VIOLATION OF THE FIFTH AND FOURTEENTH AMENDMENTS TO THE FEDERAL CONSTITUTION AND SECTION 16, ARTICLE I OF THE OHIO CONSTITUTION.
 ASSIGNMENT OF ERROR III PHOTO ARRAY WAS IMPERMISSIBLY SUGGESTIVE DENYING APPELLANT DUE PROCESS OF LAW GUARANTEED UNDER THE FIFTH AND FOURTEENTH AMENDMENTS TO THE FEDERAL CONSTITUTION AND SECTION 16, ARTICLE I OF THE OHIO CONSTITUTION.
 ASSIGNMENT OF ERROR IV STATE COMMITTED PROSECUTORIAL MISCONDUCT AT TRIAL DENYING APPELLANT A FAIR TRIAL GUARANTEED UNDER THE FIFTH, SIXTH AND FOURTEENTH AMENDMENTS TO FEDERAL CONSTITUTION AND SECTIONS 5 AND 10, ARTICLE I OF THE OHIO CONSTITUTION.
 ASSIGNMENT OF ERROR V APPELLANT DENIED EFFECTIVE ASSISTANCE OF COUNSEL GUARANTEED UNDER THE SIXTH AMENDMENT TO FEDERAL CONSTITUTION AND SECTION 10, ARTICLE I OF THE OHIO CONSTITUTION.
 I, II
Appellant, in his first two assignments of error, argues that his conviction for aggravated burglary was against the sufficiency and manifest weight of the evidence since there was not sufficient credible evidence of a trespass into the Keim home. In State v. Jenks (1981),61 Ohio St.3d 259, the Ohio Supreme Court set forth the standard of review when a claim of insufficiency of the evidence is made. The Ohio Supreme Court held: An appellate court's function when reviewing the sufficiency of the evidence to support a criminal conviction is to examine the evidence admitted at trial to determine whether such evidence, if believed, would convince the average mind of the defendant's guilt beyond a reasonable doubt. The relevant inquiry is whether, after viewing the evidence in a light most favorable to the prosecution, any rational trier of fact could have found the essential elements of the crime proven beyond a reasonable doubt.
Jenks, supra, at paragraph two of the syllabus. On review for manifest weight, a reviewing court is to examine the entire record, weigh the evidence and all reasonable inferences, consider the credibility of the witnesses and determine "whether in resolving conflicts in the evidence, the jury clearly lost its way and created such a manifest miscarriage of justice that the conviction must be reversed . . . The discretionary power to grant a new trial should be exercised only in the exceptional case in which the evidence weighs heavily against the conviction." State v. Thompkins (1997), 78 Ohio St.3d 380, 387, citing State v. Martin (1983), 20 Ohio App.3d 172, 175. Because the trier of fact is in a better position to observe the witnesses' demeanor and weigh their credibility, the weight of the evidence and the credibility of the witnesses are primarily for the trier of fact. State v. DeHass (1967), 10 Ohio St.2d 230, syllabus 1. In the case sub judice, appellant was convicted of aggravated burglary in violation of R.C. 2911.11(A)(1). Such section states as follows: (A) No person, by force, stealth, or deception, shall trespass in an occupied structure or in a separately secured or separately occupied portion of an occupied structure, when another person other than an accomplice of the offender is present, with purpose to commit in the structure or in the separately secured or separately occupied portion of the structure any criminal offense, if any of the following apply:
(1) The offender inflicts, or attempts or threatens to inflict physical harm on another; As is stated above, appellant contends that there was insufficient credible evidence of a trespass into the Keim home. We, however, disagree. At the trial in this matter, Elias Keim testified as follows:
 Q. When you went into the kitchen, you had to leave the washhouse, correct?
A. Yes.
 Q. Was he [appellant] outside your house or inside your house when you left?
A. He was on the outside of the house.
Q. Had you invited him in?
A. No.
 Q. Okay. So you go up there and you talk to your wife about whether you have any eggs?
A. Yes.
Q. And did she have any eggs?
 A. She stalled for a little bit, and she said, Well, we really don't have extra amount of eggs, but I guess we could spare two or three dozen, and that way the man would leave.
Q. And did she tell you where the eggs were?
 A. Yes, she said she has some in containers or flacks out in the washroom. If I go back out and bring those in, she'll put them in cartons so they're ready to hand to the man.
Q. What did you do next?
 A. I went back out in the washroom and went back to the corner where she told me where the eggs were and picked them up and brought them back into the kitchen.
 Q. When you walked back into the washroom to get the eggs, where was this person?
A. He'd opened the outside door and stepped on inside.
 Q. Was he already in the house when you walked in the washroom?
A. Yes.
Q. Had you asked him to come in the house?
A. No.
Q. How did that make you feel?
 A. It gave me a very uneasy feeling. I already had an uneasy gut feeling when I first seen him at the door, but my nature has never been really to have a fear of strangers and I just disregarded it. But when I went back out the second time with the eggs and I seen he had stepped inside, and I just had that feeling he was watching every step I take. I had a very uneasy feeling till I got back into the kitchen.
Trial Transcript at 191-193. There is no dispute that Elias Keim never demanded that appellant exit the Keim house. However, under the circumstances of this case, even assuming that appellant's initial entry into the Keim home was lawful, the jury was justified in inferring from the evidence that appellant's privilege to remain in such home terminated the moment appellant grabbed Elias Keim around the neck and drug him by force into the kitchen. See State v. Steffen (1987), 31 Ohio St.3d 111. The jury in this matter could justifiably infer from the facts in this matter that Elias Keim terminated appellant's privilege to remain in the home after commencement of the assault. Id. In short, we find that, based upon the evidence set forth in detail in the statement of facts, any rational trier of fact could have found that appellant trespassed by force, stealth or deception into the Keim residence, which was an occupied structure, when Elias and Sara Keim were present in the same, that appellant's purpose in committing such a trespass was to commit a criminal offense, and that appellant threatened to inflict physical harm on Elias Keim. We further find that appellant's conviction for aggravated burglary is not against the manifest weight of the evidence since, based upon the evidence in the record, the jury, as trier of fact, did not clearly lose its way so as to create a manifest miscarriage of justice. Based on the foregoing, appellant's first and second assignments of error are overruled.
 III
Appellant, in his third assignment of error, argues that the photo array used by appellee in the case sub judice was impermissibly suggestive, thereby denying appellant due process of law. At the trial in this matter, Detective Staley testified that, after the robbery of the Keim residence, he created a photo array using six numbered photographs. In addition to appellant's photograph, the array contained photographs of five other black males with similar characteristics to appellant whose photographs were computer generated. Both Elias Keim and Don Maxey picked appellant's photograph out of the array and also identified appellant in open court. Appellant now maintains that the photograph of appellant used in the array contains a "sharp red colored tone" different from all of the remaining five photographs, which have blackish or bluish tones, and that, therefore, the photo array was impermissibly suggestive. Since appellant failed to object at trial to the alleged improper photo array, we must review this assignment of error under a plain error analysis pursuant to Crim.R. 52(B). This rule provides as follows: (B) Plain Error. Plain errors or defects affecting substantial rights may be noticed although they were not brought to the attention of the court.
Under this rule, notice of plain error is to be taken with utmost caution, under exceptional circumstances and only to prevent a manifest miscarriage of justice. State v. Long (1978), 53 Ohio St.2d 91, paragraph three of the syllabus; State v. Cooperrider (1983), 4 Ohio St.3d 226,227. "It is the likelihood of misidentification which violates a defendant's right to due process". State v. Parker (1990),53 Ohio St.3d 82, 87. "Suggestive confrontations are disapproved because they increase the likelihood of misidentification, and unnecessarily suggestive ones are condemned for further reason that the increased chance of misidentification is gratuitous." Neil v. Biggers (1972),409 U.S. 188, 198. "The admission of testimony concerning a suggestive and unnecessary identification procedure does not violate due process so long as the identification possesses sufficient aspects of reliability." Manson v. Brathwaite (1977), 432 U.S. 98, 106. "[R]eliability is the linchpin in determining the admissibility" of such evidence. Id. at 114. In State v. Brown (1988), 38 Ohio St.3d 305, the Ohio Supreme Court held: Where a witness has been confronted by a suspect before trial, that witness' identification of the suspect will be suppressed if the confrontation procedure was unnecessarily suggestive of the suspect's guilt and the identification was unreliable under the totality of the circumstances.
Id. at 310, citing Manson v. Brathwaite, supra. (Emphasis added.) The central question is whether, under the totality of the circumstances, the identification was reliable even though the confrontation procedure was suggestive. Neil v. Biggers, supra at 199. The factors to be considered in evaluating the likelihood of misidentification include the following: the opportunity of the witness to view the criminal at the time of the crime, the witness' degree of attention, the accuracy of the witness' prior description of the criminal, the level of certainty demonstrated by the witness at the confrontation, and the length of time between the crime and the confrontation.
Id. at 199-200. Applying the Biggers' factors, we find no evidence of an obvious error that must be reversed to prevent a clear miscarriage of justice since we find that the out-of-court identification of appellant by both Elias Keim and Donald Maxey was reliable and, therefore, admissible. At trial, Keim testified that he had an opportunity to "look him [appellant] in the face" when Keim first answered the door and when he brought the eggs out to appellant. Trial Transcript at 193. Keim specifically testified that, in total, he looked at appellant's face for approximately ten seconds. In addition, Keim was able to provide the police with a detailed description of appellant. Keim described the robber as a slender, black male with a dark complexion and high cheekbones who was wearing a dark jacket and cap. Appellant matched such description. Next, Keim demonstrated a high level of certainty in identifying appellant out of the photo array. In addition, Keim also testified that his in-court identification of appellant was based solely on what he recalled from the day of the robbery. Trial Transcript at 216. Finally, there was not an extended length of time between the crime, which was committed on November 25, 1998, and the identification of appellant via the photo array during December of the same year. Similarly, under the totality of the circumstances, we find that Donald Maxey's out-of-court identification of appellant was reliable and, therefore, admissible. At trial, Maxey testified that, on November 25, 1998, appellant's car pulled up next to him while he was crossing the road. Maxey testified that he conversed with appellant for a minute or two and that, while doing so, he was bent down looking through the window of appellant's car and "had probably three-quarter frontal and a side [view of appellant] most of the time." Trial Transcript at 267. While Maxey testified that, after viewing appellant's photograph in the array, he was "reasonably sure but not 100 per cent positive" that the man he spoke with was appellant, he testified that, once he saw appellant in person in the court room, he was positive. Trial Transcript at 274. Maxey testified that "[s]eeing someone in person again, . . . other than a picture helps considerably." Id. Under the totality of the circumstances, we find that both Keim's and Maxey's out-of-court identification of appellant's photograph in the array was reliable. The trial court, therefore, did not commit plain error in admitting the same. Appellant's third assignment of error is, therefore, overruled.
 IV
Appellant, in his fourth assignment of error, maintains that appellee committed prosecutorial misconduct, thereby denying appellant a fair trial. Appellant specifically asserts that appellee improperly used the victims' Amish beliefs to bolster their credibility in violation of Ohio Evid.R. 610. Such rule states as follows: "Evidence of the beliefs or opinions of a witness on matters of religion is not admissible for the purpose of showing that by reason of their nature his credibility is impaired or enhanced." The test for prosecutorial misconduct is whether the prosecutor's comments and remarks were improper and if so, whether those comments and remarks prejudicially affected the substantial rights of the accused. State v. Lott (1990), 51 Ohio St.3d 160 .cert. denied112 L.Ed.2d 596; State v. Smith (1984), 14 Ohio St.3d 13. A prosecutor's conduct during trial cannot be grounds for error unless the conduct deprives the defendant of a fair trial. State v. Apanovitch (1987),33 Ohio St.3d 19, 24. The touchstone of analysis "is the fairness of the trial, not the culpability of the prosecutor." Smith v. Phillips (1982),455 U.S. 209, 219. Because appellant's counsel failed to object at trial to the alleged incidences of prosecutorial misconduct, the alleged improprieties are waived, absent plain error. State v. Slagle (1992),65 Ohio St.3d 597, 604. Accordingly, we review appellant's allegations under the plain error standard of Crim.R. 52(B). Appellant in the case sub judice initially argues that, both during opening statements, and during the direct examination of Benny Keim and Elias Keim, the prosecutor improperly bolstered the Keims' credibility by emphasizing their Amish beliefs. According to appellant, the prosecutor improperly and repeatedly attempted to demonstrate that the Amish are reluctant to testify against another. Appellant initially points out that the prosecutor, during his opening statement, indicated to the jury that it was difficult for the Amish to testify. Appellant further directs this Court to the following testimony elicited during Benny Keim's direct testimony:
 Q. Now Ben, you have said, you know, this looks similar, this looks like the car. You've been schooled in your Amish beliefs, right?
A. Yes.
Q. And is it easy for you to testify here today?
A. No.
 Q. And are the Amish — or people of Amish belief, are they reluctant to be accusers — all right. Let me rephrase it. Do you know what an "accuser" is?
A. Yes.
 Q. Are Amish people reluctant to accuse other people — do you understand what "reluctant" means?
A. Yeah.
Q. Do you understand the question?
A. Not really.
Trial Transcript at 101-102. Appellant also challenges the following testimony adduced during Elias Keim's direct testimony:
 Q. . . . Before we — well, before we go any further, you are — the records won't reflect it here through this testimony, but I'll ask you through this question. You are Amish; is that correct?
A. Yes.
 Q. And you're here testifying today in court, does that present a problem for people of Amish belief?
 A. To a certain extent. It's a new issue for our Amish community. And always with a new issue, it's debated. Our one primary concern in life is that we follow the principles of the Bible as we understand it and interpret them. And there are areas where we get into maybe a gray area, and we don't have any clear instructions. And our biggest concern in problems like that, we try hard not to accuse or take revenge of any person. And we were afraid maybe coming in here and testifying might borderline on that. And that is the reason of our concern. But on the other hand we always try to willingly state the simple truth if we are called to do that. And for that reason, I'm in here.
Trial Transcript at 187-188. Upon our review of the record, we find that the above testimony was not offered to enhance the Keims' credibility, but rather to provide the jury with an understanding of the reluctance of the Amish to accuse and identify those who have wronged them. As appellee notes in its brief, during questioning, both Elias Keim and Benny Keim were hesitant to state positively that the cap, the jacket and the vehicle in the photographs that were taken by the Sheriff's Department during their investigation were appellants. For example, Benny Keim, when asked whether the car pictured in the photograph admitted as appellee's exhibit 5 was the car that the robber had been driving, testified that it "looks very similar." Trial Transcript at 99. When presented with photographs of the jacket and cap that were seized after a search of appellant's residence, he responded in a similar manner, testifying that both looked "very similar" to what he had seen the robber wearing. Trial Transcript at 100-101. Similarly and most importantly, Elias Keim, when asked to identify appellant in court, testified that "[t]he person that's seated at the table looks very much like the person who robbed us." Trial Transcript at 215 (Emphasis added). Elias Keim further testified that the jacket, hat and car shown in the photographs that were admitted into evidence looked very similar to the robber's jacket, cap and car. In short, we concur with appellee that, based on the above testimony, "[a]bsent some background regarding the Amish cultural reluctance to accuse and identify those who wrong them, the jury might well assume that such answers to questions indicate uncertainty in the mind of the witness." As is stated above, appellant also takes issue with the prosecutor's statements during closing arguments. According to appellant, the most egregious violation of Evid.R. 610 occurred during closing arguments when the appellee said, in part, as follows: Now you and I, we know the neighbor is going to call the police. The Keims knew the neighbors were going to call the police. But in their culture, in their faith, they are so reluctant to be accusatory or vengeful, that that was the words that they had to use to report this crime.
And when you think about that, when you think about all the testimony of Mr. Keim and Mr. — or his son and how they phrased things, very carefully done, so that they can come in here and testify and still be square with their beliefs. It was difficult for them. You've all heard that in the past. Very rare to have an Amishman [sic] in here to testify.
I urge you to, as we're talking about the testimony of Elias Keim and his son, I urge you to be sensitive to that. There's many kinds of witnesses that come in this courtroom. Sometimes you have children that come in here and we have to take that witness as we find it and try to understand that witness's testimony through the eyes of that witness and how they talk and how they phrase things. The same with people of other cultures. If you had Japanese people in here, you have to view that testimony in a way — who it's coming from. I ask you you [sic] have to do the same thing here with Elias and his son Benny. You have to view their testimony through the eyes of a Amishman. * * * * And my recollection of this is he [Elias Keim] said, I did not pick the man out of the lineup because of the photograph was different. I picked the man out because he was the one that robbed me. That's an Amishman saying that. That's pretty powerful stuff. . . .
Now keep in mind when an Amishman is saying "I believe it's the defendant," this is the same guy remember who sent his son to say, I've been robbed but don't say send the police because, remember, we're not accusatory people. We're not to take revenge.
Trial Transcript at 354-355, 364. The standard for prosecutorial misconduct predicated upon improper remarks of counsel during argument, which were not objected to, is whether such statements denied appellant a fair trial. State v. DeNicola (1955), 163 Ohio St. 140. The prosecution is entitled to a certain degree in latitude in summation. State v. Liberatore (1982), 69 Ohio St.2d 583, 589. In reviewing allegations of prosecutorial misconduct, it is our duty to consider the complained-of conduct in the context of the entire trial. Darden v. Wainwright (1986),477 U.S. 168. The closing argument is considered in its entirety to determine whether it was prejudicial. State v. Moritz (1980),63 Ohio St.2d 150, 157. We find that portions of the prosecutor's above statements during closing arguments crossed the line since they clearly were intended to enhance the Keims' credibility. However, in light of the overwhelming evidence of appellant's guilt presented during the entire trial, we do not find that this statement created a manifest miscarriage of justice so as to require reversal. Appellant's fourth assignment of error is, therefore, overruled.
 V
Appellant, in his fifth assignment of error, contends that he was denied the effective assistance of trial counsel, thereby denying him a fair trial. Appellant specifically argues that his trial counsel was ineffective in failing to object to the use of the photo array and in failing to object to the use of the victims' Amish religion to bolster their credibility. A claim of ineffective assistance of counsel requires a two-prong analysis. The first inquiry in whether counsel's performance fell below an objective standard of reasonable representation involving a substantial violation of any of defense counsel's essential duties to appellant. The second prong is whether the appellant was prejudiced by counsel's ineffectiveness. Lockhart v. Fretwell (1993), 506 U.S. 364; Strickland v. Washington (1984), 466 U.S. 668; State v. Bradley (1989),42 Ohio St.3d 136. In determining whether counsel's representation fell below an objective standard of reasonableness, judicial scrutiny of counsel's performance must be highly deferential. Bradley,42 Ohio St.3d at 142. Because of the difficulties inherent in determining whether effective assistance of counsel was rendered in any given case, a strong presumption exists that counsel's conduct fell within the wide range of reasonable, professional assistance. Id. In order to warrant a reversal, the appellant must additionally show he was prejudiced by counsel's ineffectiveness. This requires a showing that there is a reasonable probability that but for counsel's unprofessional errors, the result of the proceeding would have been different. Bradley, supra at syllabus paragraph three. A reasonable probability is a probability sufficient to undermine confidence in the outcome. Id. It is with this framework in mind that we address the instances of alleged ineffectiveness of counsel raised by appellant in the instant case. Assuming, arguendo, that trial counsel was ineffective in failing to challenge the photo array and in failing to object to the evidence of the victim's Amish beliefs, we still find that appellant was not denied the effective assistance of trial counsel. Specifically, we find that appellant cannot meet his burden of showing that there is a reasonable probability that, had trial counsel objected to the use of the photo array and the use of their Amish religion to bolster the Keim's credibility, the result of appellant's trial would have been different. Even if the photo array identification had been excluded at trial, based on the in-court identification of appellant by Elias Keim and Donald Maxey, the outcome of appellant's trial would not have been different. In short, based on the evidence presented at appellant's trial, including Elias Keim's and Donald Maxey's in-court identification of appellant, we find that there was overwhelming evidence of appellant's guilt. Furthermore, even if evidence of the Keim's Amish beliefs had been excluded, the outcome of the trial would not have differed since, as set for in detail above, there was overwhelming evidence of appellant's guilt.
Appellant's fifth assignment of error is, therefore, overruled. The judgment of the Ashland County Court of Common Pleas is affirmed.
 _____________ Edwards, P.J.
Farmer, J. and Wise, J. concurs.