[Cite as *In re D.M.*, 2016-Ohio-3270.]

IN THE COURT OF APPEALS OF OHIO

TENTH APPELLATE DISTRICT

| | | |
|---|---|---|
| In the Matter of: | : | |
| D.M., | : | No. 15AP-763 |
| | | (C.P.C. No. 14JU-10022) |
| (Appellant). | : | |
| | | (REGULAR CALENDAR) |
| | : | |

---

D E C I S I O N

Rendered on June 2, 2016

---

**On Brief:** *Yeura Venters*, Public Defender, and *George M. Schumann*, for appellant. **Argued:** *George M. Schumann.*

**On Brief:** *Ron O'Brien*, Prosecuting Attorney, and *Katherine J. Press*, for appellee. **Argued:** *Katherine J. Press.*

---

APPEAL from the Franklin County Court of Common Pleas,
Division of Domestic Relations, Juvenile Branch

TYACK, J.

{¶ 1} D.M. is appealing his adjudication of being a delinquent minor. For the reasons that follow, we affirm the judgment of the trial court.

**PROCEDURAL BACKGROUND**

{¶ 2} On August 5, 2014, a sworn complaint was filed alleging that D.M. was a delinquent minor, charging him with one count of burglary, in violation of R.C. 2911.12(A)(1), a felony of the second degree.

{¶ 3} Burglary is defined by R.C. 2911.12(A)(1) as follows:

> Trespass in an occupied structure or in a separately secured or separately occupied portion of an occupied structure, when another person other than an accomplice of the offender is present, with purpose to commit in the structure or in the separately secured or separately occupied portion of the structure any criminal offense.

{¶ 4}   The complaint alleged that on August 4, 2014, D.M. trespassed into an occupied structure when he climbed up the rear fire escape then entered an unlocked door of a residence located at 1952 Iuka Avenue with the purpose to commit theft.

{¶ 5}   After an adjudication hearing on October 15, 2014, a magistrate of the Franklin County Court of Common Pleas, Division of Domestic Relations, Juvenile Branch, concluded that the state of Ohio had not proven that D.M. had committed the offense of burglary, but that the state of Ohio had proven that D.M. had committed the offense of theft as defined in R.C. 2913.02.  The magistrate reasoned that the state had failed to prove beyond a reasonable doubt that D.M. had trespassed with the purpose to commit theft.

{¶ 6}   The state filed a motion for reconsideration of the decision of the magistrate, pointing out that D.M. had not been charged with theft and that theft was not, strictly speaking, a lesser included offense of burglary.  The magistrate agreed and vacated the finding as to theft, but also maintained that the state failed to prove beyond a reasonable doubt that D.M. had committed burglary.

{¶ 7}   The state of Ohio filed objections to the findings of the magistrate.  The judge assigned to the case sustained the objections and entered a finding that the state had in fact proved the offense of burglary.  The judge found that, although D.M. was granted permission to use the restroom by a resident, his subsequent commission of a theft caused him to lose any privilege he had to be on the premises.  (Apr. 24, 2015, Jgmt. Entry at 2-3.) The judge concluded that D.M. became a trespasser at the moment he formed the intent to commit the theft, thus committing burglary.  (Apr. 24, 2015 Jgmt. Entry at 5.)  The case was remanded to the magistrate to conduct further proceedings and, after the proceedings were journalized, this appeal was filed.

**THE RECORD AT TRIAL**

{¶ 8}   The state's first witness at the adjudication hearing was Josiah Charlemagne.  Josiah was a full time student at The Ohio State University.  (Oct. 16, 2014 Tr. at 20.)  On August 14, 2014, Josiah was living at 1952 Iuka Avenue in Columbus, Ohio.

*Id.* Josiah testified that on the evening of August 14, 2014, approximately seven people were in the process of moving out of the house.[1] (Tr. at 22.)

{¶ 9} The house on Iuka Avenue is a 15-bedroom private residence that was leased by 15 members of the same fraternity. (Tr. at 35-36.) There are five bathrooms in the house, one on each of the three floors that are available to all occupants and two more private bathrooms connected to two of the bedrooms. (Tr. at 40-41.)

{¶ 10} Four individuals came to the door and asked for a resident named Christian. (Tr. at 23.) At first Josiah told them that Christian was not there, but while other people were talking to the four, Josiah "went back to talk to Christian to see what he wanted me to do." *Id.*

{¶ 11} After the individuals left, Josiah noticed that his iPhone was missing from the first floor windowsill in the main room where he had set it down. (Tr. at 24.) One of Josiah's roommates called the police. (Tr. at 25.) The police took Josiah to a scene where four people were being detained. (Tr. at 27.) Josiah recognized three of the four individuals being held by the police. (Tr. at 28.) He identified D.M. in the courtroom as one of the four individuals. *Id.* Josiah identified his phone by a screw that was missing, and the police returned Josiah's phone to him at the scene. (Tr. at 29.) Josiah testified that when he opened the door that night he did not give anyone permission to enter the house. (Tr. at 31.) Josiah stated that he assumed the four persons were the persons who had been to the house several times in the past asking for Christian. (Tr. at 30.) In his opinion, the occupants of the house did not want them there because they were suspected of stealing things from the house. (Tr. at 31.)

{¶ 12} Despite his earlier testimony that he did not recognize the four individuals when they came to the house, on cross-examination Josiah admitted that he gave a statement to the police that he recognized the four individuals "as kids that have been around our house before." (Tr. at 24, 34.) He also told police that he had gone to tell Christian that the four were there and, as Christian went out to talk to them, some of them proceeded to enter the house and that Christian was with them. (Tr. at 37, 40.) Josiah

---

[1] The transcript references the date of August 14, 2014, but the charges were filed on August 5, 2014, and the state contends the events in question actually occurred on August 4, 2014.

admitted that he initially lied to the four about Christian not being there because he did not want them around the house and hoped that they would leave. (Tr. at 38.)

{¶ 13} The next witness for the state was Daniel Rine, another OSU student who lived at 1952 Iuka Avenue on August 4, 2014. (Tr. at 44.) Daniel testified that he was on the third floor sweeping when he heard people talking outside, so he went down the fire escape and talked to four persons who were asking for Christian. (Tr. at 45-46.) Daniel told them Christian was not there, and returned inside to continue sweeping up. (Tr. at 46.)

{¶ 14} Daniel then heard the third floor fire escape open and close and when he went to investigate, encountered an individual standing there. *Id.* Daniel asked the person what he was doing there, and the individual replied that he was looking for a TV. *Id.* Daniel told the person that the TVs that were being discarded were downstairs. *Id.* Then the person asked if he could use the bathroom, and Daniel replied: "No, you can leave and like go back down the fire escape." (Tr. at 47.) Daniel identified D.M. as the person on the third floor. *Id.* Daniel then said that, after he asked D.M. to leave, D.M. went back down the fire escape. (Tr. at 48.)

{¶ 15} The state's next witness was Lucas Simon, another OSU student who lived at 1952 Iuka Avenue on August 4, 2014. (Tr. at 58.) Lucas also encountered the individuals looking for Christian. (Tr. at 59.) Lucas went to find Christian and told him he should go talk to them. *Id.* Lucas described the following encounter with a 6'4" African-American male wearing a hat who walked in alone through the back door of the house:

> I said 'What are you doing,' he said, 'I'm using the bathroom.'
> I just said 'Well, take him back.' He said 'okay.' Watch him - -
> I go in the direction of the bathroom. I knew my other
> roommates were in there so I really didn't think much of it
> and he just went to the bathroom, or that's what I thought.

(Tr. at 60.)

{¶ 16} Lucas denied that the person specifically asked to use the bathroom, and denied giving the person permission to enter the house. (Tr. at 61-62.) Lucas identified D.M. as the person he saw walking in the back door of the house. *Id.* On cross-examination, Lucas stated that he told the police that night that he watched D.M. and

made sure he went in the direction of the bathroom. (Tr. at 65.) Lucas also stated there were some nonresidents helping the residents move out that evening. There were also TVs set out back by the garbage. (Tr. at 68-69.) Lucas stated that he was apprehensive, confused, and taken back when D.M. just walked into the house. (Tr. at 72-73.) After saying "okay" to D.M.'s statement that he was going to use the bathroom, Lucas did not tell D.M. to leave. (Tr. at 74.)

{¶ 17} The state's next witness was Christian Cottington. Christian was a student at OSU and lived at 1952 Iuka Avenue on August 4, 2014. (Tr. at 76-77.) Christian described a group of four or five gentlemen who came to the house asking for him. (Tr. at 78.) He went to talk to them, but stated he was nervous because he suspected they had stolen from his roommates previously when they had come to the house. (Tr. at 79-80, 82.) Christian had met D.M. before at McDonald's on High Street. (Tr. at 80.) Christian stated that he did not invite the gentlemen inside, nor did he give them permission to come in. (Tr. at 81.)

{¶ 18} On cross-examination, Christian stated that on the night he met D.M. he had been drinking at the bars and was intoxicated. (Tr. at 87.) D.M. and his friends had walked back to 1952 Iuka Avenue with Christian. (Tr. at 86). D.M. and the group visited for about an hour discussing hip-hop and rap. (Tr. at 89.) The next morning one of Christian's roommates discovered his wallet was missing. (Tr. at 92-93.) Christian did not have any reason to suspect the group at that time. (Tr. at 93.)

{¶ 19} The state's next witness was Officer Neal Tolman of the Columbus Police Department. (Tr. at 96.) On the night of August 4, 2014, Officer Tolman responded to a theft report at 1952 Iuka Avenue. (Tr. at 96-98, 103.) Officer Tolman called another officer to report the witnesses' description of the suspects and discovered that the officer had already detained a group of suspects. (Tr. at 99.) Officer Tolman took Daniel Rine and another witness to the scene where Daniel told Officer Tolman that D.M. was the individual who had entered the house and encountered Daniel. (Tr. at 101.) Officer Tolman then directed that D.M. be taken into custody. *Id.*

{¶ 20} The final witness for the state was another Columbus Police Officer, Sean Taylor. (Tr. at 105.) Officer Taylor located and detained a group of four male blacks matching the description he had received on his computer. (Tr. at 106.) Officer Taylor

patted them down and found that the suspect subsequently identified as D.M. had a second cell phone in his back right pocket. (Tr. at 108.)  The boys' told Officer Taylor that they were walking from the basketball courts to the cages. *Id.* This aroused Officer Taylor's suspicions because they were several blocks northeast of where they said they were going.  (Tr. at 108-09.)  D.M. was identified during a show-up and placed under arrest. (Tr. at 111-13.) Josiah Charlemagne identified his phone and was allowed to take it with him.  (Tr. at 113-14.)

{¶ 21} The defense called one witness, Deiontay M., D.M.'s brother. (Tr. at 119-20.) Deiontay testified that earlier that day he and D.M. and two others had been playing basketball on a court off of 11th Avenue and North High Street for about five hours. (Tr. at 120.)  The group then went to McDonald's to eat and then stopped at Christian's house. (Tr. at 121.)  When asked how he knew Christian, Deiontay stated: "He actually sells weed." *Id.*  They knocked on the door and noticed people were cleaning the house. (Tr. at 122.)  At first they were told Christian was not there, but after a while they brought Christian to the front door.  (Tr. at 123.)

{¶ 22} Christian came outside where they talked a bit. *Id.* Then Christian invited them inside the house, and as they were walking through the house, D.M. asked to use the restroom.  *Id.* Out back were some TVs that Deiontay was not interested in. (Tr. at 124.) Deiontay saw D.M. head toward the bathrooms on the bottom floor (Tr. at 125.)  They knew the bathroom was there from when they had been invited in about a week prior and spent several hours socializing.  *Id.*

{¶ 23} Deiontay stated that he did not know that D.M. had taken the phone, and he did not know that D.M. had two phones until the police removed the second phone from D.M. at the site of the detention.  (Tr. at 134-35.)

{¶ 24} During the defense opening statement, counsel stated that D.M. never denied taking the phone.  (Tr. at 11.)  Counsel stated that the issue in the case was whether the four boys had permission to enter the residence.  (Tr. at 12.)

{¶ 25} During closing argument, defense counsel stated:

> We've acknowledged to the Court, and we've admitted from jump, in fact, [D.M.] admitted to the police that night and the detective that he took the phone.  * * * I do submit that this is a simple theft.

* * *

> Clearly the issue here is permission. Clearly they had permission and clearly [D.M.] has been forthright with the officers from the beginning that he did in fact take the phone. That's all we have here, a simple theft.

(Tr. at 141-44.)

{¶ 26} The prosecution made the following argument during its rebuttal closing argument:

> Your Honor, first of all, there is absolutely no evidence that [D.M.] admitted that he stole this phone. Police officers said when patting [D.M.] down, incident to this arrest, he found the phones and removed them. So, there is not what -- one wit of evidence that this young man cooperated about what he was being arrested for.

(Tr. at 145.)

## ASSIGNMENT OF ERROR

{¶ 27} On appeal, D.M. assigns a single error for our consideration:

> The trial court erred in adjudicating the minor-child delinquent of burglary in that there was insufficient evidence to support such a finding, and the trial court's judgment was against the manifest weight of the evidence.

## DISCUSSION

{¶ 28} On appeal, D.M. argues the evidence was insufficient to demonstrate all the elements of burglary, and the judgment was against the manifest weight of the evidence.

{¶ 29} In *State v. Tucker*, 10th Dist. No. 15AP-434, 2016-Ohio-1033, ¶ 10-12, this court laid out the standards for sufficiency of evidence and manifest weight:

> Sufficiency of evidence is a "legal standard that tests whether the evidence introduced at trial is legally sufficient to support a verdict." *State v. Cassell*, 10th Dist. No. 08AP-1093, 2010-Ohio-1881, ¶ 36, citing *State v. Thompkins*, 78 Ohio St.3d 380, 386, 1997 Ohio 52, 678 N.E.2d 541 (1997). When judging the sufficiency of the evidence to support a criminal conviction, an appellate court must decide if, "after viewing the evidence in a light most favorable to the prosecution, any rational trier of fact could have found the essential elements of

the crime proven beyond a reasonable doubt." *State v. Jenks*, 61 Ohio St.3d 259, 574 N.E.2d 492 (1991), paragraph two of the syllabus. Where the evidence, "if believed, would convince the average mind of the defendant's guilt beyond a reasonable doubt," it is sufficient to sustain a conviction. *Id.*

"While sufficiency of the evidence is a test of adequacy regarding whether the evidence is legally sufficient to support the verdict as a matter of law, the criminal manifest weight of the evidence standard addresses the evidence's effect of inducing belief." *Cassell* at ¶ 38, citing *State v. Wilson*, 113 Ohio St.3d 382, 2007-Ohio-2202, ¶ 25, 865 N.E.2d 1264. *See also Thompkins* at 387 ("Although a court of appeals may determine that a judgment of a trial court is sustained by sufficient evidence, that court may nevertheless conclude that the judgment is against the weight of the evidence."). An appellate court must review the entire record, weighing the evidence and all reasonable inferences, consider the credibility of witnesses, and determine whether, in resolving conflicts in the evidence, the trier of fact clearly lost its way and created such a manifest miscarriage of justice that the conviction must be reversed and a new trial ordered. *Id.*, citing *State v. Martin*, 20 Ohio App.3d 172, 175, 20 Ohio B. 215, 485 N.E.2d 717 (1st Dist.1983). This authority " 'should be exercised only in the exceptional case in which the evidence weighs heavily against the conviction.' " *Thompkins* at 387, quoting *Martin* at 175.

"[A] defendant is not entitled to a reversal on manifest weight grounds merely because inconsistent evidence was presented at trial." *State v. Spires*, 10th Dist. No. 10AP-861, 2011-Ohio-3312, ¶ 18, citing *State v. Raver*, 10th Dist. No. 02AP-604, 2003-Ohio-958, ¶ 21. The trier of fact is free to believe or disbelieve any or all of the testimony. *Id.,* citing *State v. Jackson*, 10th Dist. No. 01AP-973, 2002-Ohio-1257. Thus, although an appellate court acts as a "thirteenth juror" in considering the weight of the evidence, it must give great deference to the fact finder's determination of witness credibility. *Id.*, citing *State v. Covington*, 10th Dist. No. 02AP-245, 2002-Ohio-7037, ¶ 22.

{¶ 30} Specifically, D.M. argues that he had permission to be in the building, and there is no evidence if or when in the sequence of events D.M. formed the purpose to steal the phone. While there is some circumstantial evidence that D.M. actually took the

phone, he contends that it was not proven beyond a reasonable doubt that D.M. was the person who actually took the phone. D.M. argues that the evidence did not show whether D.M. stole the phone or someone else in the group of four stole it and gave it to D.M. after they left the fraternity house where Josiah lived.

{¶ 31} D.M. contends that if he did not actually take the phone from the building, and received it outside the residence from one of the other persons in his group, then he did not form a purpose to commit theft in the building. Without evidence that D.M. formed the purpose to commit theft inside the building, then any finding that his privilege to be in the building was revoked was in error, and the state has failed to prove the element of trespass.

{¶ 32} The trial court judge found that D.M. had permission to be in the residence to use the restroom. (Apr. 24, 2015 Jgmt. Entry at 2.) However, the trial court judge found that once D.M. formed the purpose to steal the phone he lost his privilege to be on the premises and turned his presence into a trespass by his conduct inside. (Apr. 24, 2015 Jgmt. Entry at 5.)

{¶ 33} The trial court judge compared D.M.'s case to the case of *State v. Steffen*, 31 Ohio St.3d 111 (1987). Steffen was a door-to-door salesman who was allowed into a woman's home to demonstrate a cleaning product. While in the home, Steffen at first began demonstrating the product, but then he attacked and killed the woman. The case became a death penalty case with a specification that the murder occurred in the course of an aggravated burglary. The Supreme Court of Ohio acknowledged that Steffen was allowed into the residence with the permission of the resident, but then found that the encounter became a burglary when Steffen became violent. Thus, a person could lawfully enter a residence under one set of circumstances but then become a trespasser under a different set of circumstances. This was a new interpretation of the burglary statute.

{¶ 34} In *Steffen*, the Supreme Court distinguished its prior holding in *State v. Barksdale*, 2 Ohio St.3d 126 (1983), with respect to a privilege to be on the premises. In *Barksdale*, the accused entered an automobile dealer's car lot, open to the public, and broke into a locked car. The Supreme Court held that the conviction for breaking and entering could not be upheld because the element of trespass could not be proven. The *Barksdale* court reasoned that the automobile dealer's tacit invitation to the general

public to enter the lot was a grant of privilege and that one who entered the lot with the purpose of committing a felony thereon did not relinquish the privilege, and therefore trespass could not be proven. *Steffen* at 115; *Barksdale* at 128.

{¶ 35} The Supreme Court espoused two bases for distinguishing *Barksdale* from *Steffen*. First, a private home was involved in *Steffen*, and the court noted the interest of a private person in the inviolability of his home is materially greater than that of a business owner in his business premises. *Steffen* at 115. Second, the court noted that the felony committed on the premises in *Steffen* was one of violence, and a privilege once granted may be revoked. In *Steffen*, the court found that the jury was justified in inferring that any privilege to enter the premises for purposes of demonstrating a household product was terminated the moment the defendant commenced his assault. *Id.*

{¶ 36} This court has had occasion to apply the holding of *Steffen* in circumstances very similar to the present case. In *State v. Barnhart*, 10th Dist. No. 91AP-827 (Feb. 27, 1992), Barnhart and another man were seen leaving a fraternity house in The Ohio State University area. The men were carrying the fraternity's wide-screen TV. This court stated that even assuming that someone in the fraternity invited him to visit, the permission to visit was not a permission to steal, and pursuant to *Steffen,* a person can originally be in an occupied structure legally but turn the presence into a trespass by his or her conduct once on the premises. *Id.* at 3.

{¶ 37} In *State v. Parsons*, 10th Dist. No. 06AP-410, 2007-Ohio-1204, the defendant was visiting at his parents' house and asked for something to eat and clean clothes to wear for a job he was to start on the next day. *Id.* at ¶ 5. While the parents were preoccupied in another room, the defendant went into their bedroom, took a T-shirt from the father's dresser, and slipped out of the house. The couple soon realized the defendant was gone and missing from their bedroom was the bank bag from the father's dry cleaning business containing around $100 and the keys to the business. *Id.*

{¶ 38} This court found that the trial court was justified in inferring that the defendant's privilege to be in his parents' house terminated when he sneaked into his parents' room to steal the bank bag. *Id.* at ¶ 30.

{¶ 39} Applying this rule to the present case leads to the conclusion that even if D.M. had permission to enter the premises at 1952 Iuka Avenue, under Supreme Court of

Ohio precedent and precedent from this district, he lost his privilege to be there, and turned his presence into a trespass when he took the iPhone from the front room windowsill.

{¶ 40} D.M. further argues however, that insufficient evidence supports the conclusion that he actually removed the stolen iPhone from the house.

{¶ 41} "[I]t is well-established in Ohio that the unexplained possession of recently stolen property presents a permissive inference that the accused is guilty of theft or burglary." *State v. Brown*, 10th Dist. No. 05AP-601, 2006-Ohio-2307, ¶ 11, citing *State v. Griggs*, 10th Dist. No. 89AP-1417 (Sept. 18, 1990). *See also State v. Simon*, 6th Dist. No. H-04-026, 2005-Ohio-3208, ¶ 14-16 ("[T]he trier of fact is no longer required to ascertain whether all inferences exclude all hypothesis of innocence.").

{¶ 42} In *Brown*, as in this case, the defendant argued that his unexplained possession of recently stolen property only showed that he may have received stolen property, not that he was the person who broke into a residence to steal.  After a home burglar alarm went off, the police found bicycle tracks and footprints in the snow. One of the officers followed the bicycle tracks directly to defendant, who was still on the bicycle and had a duffle bag containing a power drill. The victim identified both the drill and the bicycle as his property. *Id.* at ¶ 4-5. This court acknowledged that the case turned on circumstantial evidence but found the evidence sufficient to sustain a burglary conviction, and that the conviction was not against the manifest weight of the evidence.

{¶ 43} Here, shortly after the boys left the residence, the phone was missing.  D.M. was detained in the vicinity of the theft within minutes of the theft being reported, was still with the same group of friends, and was identified as one of the individuals admitted into the residence.  D.M. had two cell phones in his possession when he was patted down, and one of them was the recently stolen iPhone.  D.M. was also identified as the individual who broke off from the others, ostensibly to use the restroom, thus giving him opportunity to steal the iPhone.  When stopped by Officer Taylor, the boys' story of where they were coming from and going to did not make sense to the officer because they were several blocks northeast of where they should be if their story were true.

{¶ 44} In sum, even though the evidence indicated that D.M. may have initially had permission to be in the residence, he did not have permission to be in the house in order

to steal an item from the house. The evidence supported a finding that D.M. was a trespasser in Josiah's residence and the discovery of the stolen property in D.M.'s possession shortly after the phone was found to be missing supports the finding that he was guilty of burglary.

**CONCLUSION**

{¶ 45} The sole assignment of error is overruled. The adjudication of delinquency is affirmed.

*Judgment affirmed.*

BROWN and KLATT, JJ., concur.

———————————