[Cite as *State v. Sumlin*, 2020-Ohio-1600.]

## COURT OF APPEALS OF OHIO

## EIGHTH APPELLATE DISTRICT
## COUNTY OF CUYAHOGA

| | | |
|---|---|---|
| STATE OF OHIO, | : | |
| Plaintiff-Appellee, | : | |
| | | No. 108000 |
| v. | : | |
| ROSS SUMLIN, JR., | : | |
| Defendant-Appellant. | : | |

JOURNAL ENTRY AND OPINION

**JUDGMENT:** AFFIRMED
**RELEASED AND JOURNALIZED:** April 23, 2020

Criminal Appeal from the Cuyahoga County Court of Common Pleas
Case No. CR-17-623480-A

### *Appearances:*

Michael C. O'Malley, Cuyahoga County Prosecuting Attorney, and Jennifer M. Meyer, Assistant Prosecuting Attorney, *for appellee.*

Charles Ruiz-Bueno Co., L.P.A., and J. Charles Ruiz-Bueno, *for appellant.*

FRANK D. CELEBREZZE, JR., P.J.:

{¶ 1} Defendant-appellant, Ross Sumlin, Jr., brings the instant appeal challenging his convictions for aggravated robbery, aggravated burglary, felonious assault, kidnapping, and having weapons while under disability. Appellant argues

that his convictions were not supported by sufficient evidence and against the manifest weight of the evidence. After a thorough review of the record and law, this court affirms.

## I. Factual and Procedural History

{¶ 2} This case involves a robbery and shootout that occurred on October 12, 2016, at Prodigy Cuts Barbershop on Storer Avenue in Cleveland, Ohio. The barbershop's owner, Rachad Ahmad, and another barber, Abdiel Espinal-Collazo, were getting ready to close the shop for the day. There were two customers inside the shop: Ahmad's cousin, Yusef Suleiman, and Suleiman's five-year-old nephew, S.S.

{¶ 3} Sometime after 7:00 p.m., appellant entered the barbershop and asked for a "lineup."[1] Ahmad was still cutting S.S.'s hair, so he told appellant to take a seat in the lobby until Espinal-Collazo could take care of him. Appellant sat down in the lobby and began texting or playing on his phone.

{¶ 4} Approximately two minutes after appellant entered the barbershop, two armed individuals, Rayshaun Perkins (a.k.a. "worm") and Deshon Pennyman, entered the shop, approached Ahmad and Espinal-Collazo, and ordered them to turn over their belongings.

{¶ 5} Unbeknownst to Perkins and Pennyman, Ahmad and Espinal-Collazo were also carrying firearms. When they observed Perkins and Pennyman enter the

---

[1] A "lineup" is edging a clean line around the face and head. (Tr. 223.)

shop and demand that everyone turn over their belongings, Ahmad and Espinal-Collazo drew their weapons and began firing at Perkins and Pennyman.[2]  Perkins and Pennyman exchanged fire with Ahmad and Espinal-Collazo.

{¶ 6} Perkins and Pennyman retreated and ran out the front of the barbershop.  Pennyman sustained a gunshot wound to his chest during the shootout.

{¶ 7} Ahmad believed that appellant was also firing shots during the shootout because he saw "flashes" coming from the corner where appellant had been sitting. Ahmad acknowledged that he was not certain that appellant was firing shots because it was very dusty during the shootout.  After observing the "flashes" in the area where appellant was sitting, Ahmad and Espinal-Collazo fired shots in this direction. Appellant made his way out of the barbershop, but not before sustaining a gunshot wound.

{¶ 8} After running out of the barbershop, Perkins and Pennyman jumped into the "getaway" car parked around the corner from the barbershop, and the driver, Anthony Patterson, drove Pennyman to MetroHealth Medical Center ("Metro").  The group did not wait for appellant before fleeing the area, they left him behind at the barbershop.  Pennyman explained that they were not concerned about leaving appellant behind because as far as everyone else was concerned, appellant "had nothing to do with [the shooting]."  (Tr. 426.)  Pennyman testified that Perkins called appellant and told him he was taking Pennyman to the hospital.

---

[2] Suleiman testified that Espinal-Collazo fired the first shot.  (Tr. 316.)

{¶ 9} Suleiman, S.S., and Espinal-Collazo took cover in the barbershop's bathroom. After appellant, Perkins, and Pennyman had fled from the barbershop, Ahmad crawled to the entrance and locked the door. He joined the group in the bathroom where they called 911 and waited until police arrived.

{¶ 10} Ahmad's hip was grazed by a bullet during the shootout. S.S. sustained a gunshot wound to the foot, and he was transported to Metro for treatment.

{¶ 11} Suleiman spoke with investigators at Metro. He identified Pennyman as one of the shooters. Pennyman was arrested at the hospital for his involvement in the robbery and shootout.

{¶ 12} Pennyman, a minor, negotiated a plea agreement with the state. Pennyman was charged in juvenile court, and subsequently bound over to the general division of the common pleas court. Under the plea agreement, Pennyman's case would be sent back to the juvenile court for disposition and sentencing in exchange for his testimony against Perkins and appellant. (Tr. 387.) Pennyman met with Cleveland Police Sergeant John Lally on July 21, 2017, and provided a recorded statement about the robbery.

{¶ 13} Appellant was arrested for his involvement in the robbery and shootout in December 2017. On December 13, 2017, a Cuyahoga County Grand Jury returned a 17-count indictment charging appellant with: (1) – (4) aggravated robbery, a first-degree felony in violation of R.C. 2911.01(A)(1); (5) aggravated robbery, a first-degree felony in violation of R.C. 2911.01(A)(3); (6) aggravated

burglary, a first-degree felony in violation of R.C. 2911.11(A)(1); (7) aggravated burglary, a first-degree felony in violation of R.C. 2911.11(A)(2); (8) felonious assault, a second-degree felony in violation of R.C. 2903.11(A)(1); (9) – (12) felonious assault, a second-degree felony in violation of R.C. 2903.11(A)(2); (13) – (16) kidnapping, a first-degree felony in violation of R.C. 2905.01(A)(2); and (17) having weapons while under disability, a third-degree felony in violation of R.C. 2923.12(A)(2). Counts 1-16 contained one- and three-year firearm specifications, notice of prior conviction specifications, and repeat violent offender specifications. Appellant pled not guilty during his December 18, 2017 arraignment.

{¶ 14} Appellant elected to try the notice of prior conviction and repeat violent offender specifications to the bench. A jury trial commenced on October 22, 2018. Appellant and Perkins were tried together.

{¶ 15} The following witnesses testified on behalf of the state: (1) Rachad Ahmad; (2) Natalie Pennyman; (3) Yusef Suleiman; (4) Abdiel Espinal-Collazo; (5) Deshon Pennyman; (6) Dwayne Duke; (7) Cynthia Moore; and (8) John Lally.

{¶ 16} At the close of the state's case, defense counsel moved for a Crim.R. 29 judgment of acquittal. The trial court denied defense counsel's motion.

{¶ 17} The defense did not call any witnesses. The defense renewed its Crim.R. 29 motion that the trial court denied.

{¶ 18} The jury returned its verdict on October 30, 2018. The jury found appellant guilty on all 17 counts. The trial court found appellant guilty on the

specifications underlying Counts 1-16. The trial court ordered a presentence investigation report and set the matter for sentencing.

{¶ 19} The trial court held a sentencing hearing on December 10, 2018. The trial court imposed an aggregate prison term of 18 years.

{¶ 20} On December 18, 2018, appellant filed the instant appeal challenging the trial court's judgment. He assigns two errors for review:

> I. The jury's verdict was against the manifest weight of the evidence and prejudicial against Defendant-Appellant.

> II. The evidence adduced at trial was insufficient to sustain a verdict against Defendant-Appellant for aggravated burglary.

## II. Law and Analysis

{¶ 21} For ease of discussion, we will address appellant's assignments of error out of order.

## A. Sufficiency

{¶ 22} In his second assignment of error, appellant argues that his convictions for aggravated burglary were not supported by sufficient evidence.

{¶ 23} The test for sufficiency requires a determination of whether the prosecution met its burden of production at trial. *State v. Bowden*, 8th Dist. Cuyahoga No. 92266, 2009-Ohio-3598, ¶ 12. The relevant inquiry is whether, after viewing the evidence in a light most favorable to the prosecution, any rational trier of fact could have found the essential elements of the crime proven beyond a reasonable doubt. *State v. Jenks*, 61 Ohio St.3d 259, 574 N.E.2d 492 (1991), paragraph two of the syllabus.

{¶ 24} Appellant was charged with aggravated burglary in violation R.C. 2911.11(A)(1) and (2), which provide,

> (A) No person, by force, stealth, or deception, shall trespass in an occupied structure or in a separately secured or separately occupied portion of an occupied structure, when another person other than an accomplice of the offender is present, with purpose to commit in the structure or in the separately secured or separately occupied portion of the structure any criminal offense, if any of the following apply:
>
> (1) The offender inflicts, or attempts or threatens to inflict physical harm on another;
>
> (2) The offender has a deadly weapon or dangerous ordnance on or about the offender's person or under the offender's control.

{¶ 25} In support of his sufficiency challenge, appellant contends that the state failed to demonstrate that he was trespassing in the barbershop. Appellant argues that he entered the barbershop to get a haircut, and as a result, he was a business invitee, not a trespasser.

{¶ 26} As an initial matter, appellant fails to identify any case law in support of his assertion that his aggravated burglary convictions must fail because he was a business invitee of the barbershop. *See* App.R. 16(A)(7). Furthermore, the state argues that any privilege appellant had to enter the barbershop was revoked when Pennyman and Perkins entered the barbershop and attempted to rob the barbershop at gunpoint.

{¶ 27} R.C. 2911.21(A)(1), governing criminal trespass, provides that "[n]o person, without privilege to do so, shall * * * [k]nowingly enter *or remain* on the land or premises of another[.]" (Emphasis added.) In *State v. Steffen*, 31 Ohio St.3d 111, 509 N.E.2d 383 (1997), the defendant-appellant challenged his aggravated

burglary convictions, arguing that he was granted privilege to enter the premises, a private residence, where he killed the victim. The Ohio Supreme Court explained that "a privilege once granted may be revoked." *Id.* at 115. In rejecting the defendant's argument, the court held that even if the initial entry was lawful and defendant had privilege to enter, the defendant did not have privilege to remain on the premises when he commenced a violent assault: "the felony committed, once on the premises, was one of violence, directed against a human being who had the ability and the authority to revoke the privilege of initial entry, if such privilege was in fact granted[.]" *Id.*

{¶ 28} In this case, assuming, arguendo, that appellant's initial entry into the barbershop was lawful, and Ahmad or Espinal-Collazo granted appellant privilege to enter the shop, appellant did not have privilege to remain on the premises of the barbershop. Appellant's privilege to remain inside the barbershop terminated the moment his accomplices, Pennyman and Perkins, entered the shop and commenced the armed robbery, a violent felony, directed against Ahmad and Espinal-Collazo, who had the ability and authority to revoke appellant's privilege of initial entry.

{¶ 29} Nevertheless, appellant's argument that he entered the barbershop as a business invitee rather than a trespasser is entirely unsupported by the record. As will be discussed in further detail in appellant's first assignment of error, the state's theory of the case was that appellant was an accomplice of Perkins and Pennyman, and he entered the barbershop before them as a "look-out" to case the shop and report back to them. The defense's theory of the case was that appellant was a victim

that had no involvement with and did not participate in the robbery. In other words, appellant defended against the charges below on the theory that he was a customer of the barbershop that was in the wrong place at the wrong time.

{¶ 30} Appellant's business invitee argument is premised entirely on the assumption that (1) he entered the shop for a legitimate purpose, to get a "lineup," rather than to case the shop as a "look-out" and report back to Perkins and Pennyman, and (2) he was an innocent customer and victim, rather than an accomplice of Perkins and Pennyman and participant in the robbery. This assumption is belied by Pennyman's testimony regarding appellant's involvement in the robbery. Pennyman's testimony, if believed, is sufficient to establish that appellant was, in fact, trespassing in the barbershop — appellant entered the barbershop as an accomplice and a "look-out" with the intent to commit robbery in the shop.

{¶ 31} Pennyman testified that on October 12, 2016, he was hanging out after school at Anthony Patterson's house with his best friend, his cousin, Anthony, Perkins, and appellant. They were at the house from approximately 1:00 p.m. to 7:00 p.m. The defendants, Perkins and appellant, were "[t]alking about going to rob something." (Tr. 403.) They did not converse about getting haircuts.

{¶ 32} They left Anthony's house around 7:00 p.m. Anthony was driving, and the passengers in the car were Pennyman, appellant, and Perkins. Pennyman believed that they were in appellant's girlfriend's Nissan.

{¶ 33} The original plan was to rob Pennyman's stepfather's house. They drove to the house, and Pennyman, appellant, and Perkins went inside. They were unable to steal any money from the stepfather's house. They left the house and were driving back to Anthony's house.

{¶ 34} As they were driving around, they passed Prodigy Cuts Barbershop on Storer Avenue and West 59th Street. As they drove passed the barbershop, appellant suggested that they rob the barbershop: "[appellant] said they sell drugs in [the barbershop]." (Tr. 412.)

{¶ 35} Anthony parked around the corner, facing the barbershop. Pennyman testified that before anyone got out of the car, "[appellant] said we were going to go in and rob them." (Tr. 416.) Appellant got out of the car and went in the barbershop first "[t]o look at it, look at something." (Tr. 416.) Pennyman confirmed that appellant was going to go in first and "look out," and then call the individuals in the car to let them know what he observed. Approximately one minute after appellant entered the barbershop, he called Perkins's cell phone. A few seconds after appellant called Perkins, Perkins and Pennyman went into the barbershop.

{¶ 36} Pennyman testified that Perkins and appellant were carrying firearms. Appellant had a "bigger" gun, a black .40 caliber Glock, and Perkins had a "small" gun, a pink .380 Bodyguard. Appellant did not have a gun, however, when he went into the barbershop because appellant gave his gun to Perkins and Perkins gave his gun to Pennyman.

{¶ 37} After the shootout inside the barbershop during which he sustained a gunshot wound to the chest, Pennyman testified that he ran out of the barbershop, and across the street. Perkins was running with and holding Pennyman. They got into Anthony's car. Appellant was still in the barbershop, and they left him behind. Perkins called appellant and told him they were taking Pennyman to the hospital. They were not concerned about leaving appellant behind because they believed no one knew he had any involvement in the robbery.

{¶ 38} At some point before the robbery, appellant and Perkins told Pennyman that he would not get in that much trouble if he got arrested because he is a juvenile. Pennyman testified that appellant and Perkins made "[a] couple" of threats to him and threatened that "[t]hey were going to kill me." (Tr. 442.)

{¶ 39} After reviewing the record, we find that the state presented sufficient evidence to support appellant's aggravated burglary convictions. Pennyman's testimony alone, if believed, is sufficient to establish the elements of aggravated burglary beyond a reasonable doubt. Pennyman's testimony demonstrates that appellant was an accomplice of Perkins and Pennyman, and that he entered the barbershop as a "look-out" to assess the situation inside the barbershop and report back to the group inside the vehicle. Accordingly, we find no merit to appellant's argument that he was not trespassing inside the barbershop because he entered the shop as a business invitee.

{¶ 40} For all of the foregoing reasons, appellant's second assignment of error is overruled. Appellant's aggravated burglary convictions were supported by sufficient evidence.

## B. Manifest Weight

{¶ 41} In his first assignment of error, appellant argues that his convictions were against the manifest weight of the evidence.

{¶ 42} In contrast to sufficiency of the evidence, "weight of the evidence involves the inclination of the greater amount of credible evidence." *State v. Thompkins*, 78 Ohio St.3d 380, 387, 678 N.E.2d 541 (1997). While "sufficiency of the evidence is a test of adequacy as to whether the evidence is legally sufficient to support a verdict as a matter of law, * * * weight of the evidence addresses the evidence's effect of inducing belief." *State v. Wilson*, 113 Ohio St.3d 382, 2007-Ohio-2202, 865 N.E.2d 1264, ¶ 25, citing *Thompkins* at 386-387. "In other words, a reviewing court asks whose evidence is more persuasive — the state's or the defendant's?" *Id.* The reviewing court must consider all the evidence in the record, the reasonable inferences, and the credibility of the witnesses to determine "'whether in resolving conflicts in the evidence, the jury clearly lost its way and created such a manifest miscarriage of justice that the conviction must be reversed and a new trial ordered.'" *Thompkins* at 387, quoting *State v. Martin*, 20 Ohio App.3d 172, 485 N.E.2d 717 (1st Dist.1983).

{¶ 43} In support of his manifest weight challenge, appellant argues that there was no direct evidence that he was involved with or a participant in the

robbery. Appellant's argument is entirely unsupported by the record. As noted above, Pennyman, appellant's accomplice who participated in the robbery, testified that appellant came up with the idea to rob the barbershop. Appellant went into the barbershop first to assess the situation, and then communicated his observations to Perkins. Contrary to appellant's assertion, Pennyman's testimony is direct evidence implicating appellant in the robbery.

{¶ 44} Appellant argues that his convictions are against the manifest weight of the evidence because Pennyman's testimony was "winding and tortuous," and there were several inconsistencies between Pennyman's trial testimony and the statement he provided to police during a recorded interview on July 21, 2017. Appellant contends that Pennyman's testimony was not credible because he only implicated Perkins and appellant to get a favorable deal.

{¶ 45} The state acknowledges that there were, in fact, some inconsistencies between the statement Pennyman provided to police on July 21, 2017, and his trial testimony. Pennyman provided conflicting details during his July 21, 2017 statement and his trial testimony regarding (1) Anthony's last name, (2) the amount of time he spent with appellant on the day of the robbery, (3) the reason they went to the barbershop, (4) when they talked about robbing the barbershop, and (5) whether Perkins, appellant, both, or neither called Anthony.

{¶ 46} First, regarding Anthony's last name, Pennyman testified on direct examination that he was "not sure" what Anthony's last name was. (Tr. 389.) Pennyman confirmed on cross-examination that he did not know Anthony's last

name. During his July 21, 2017 interview with Sgt. Lally, however, Pennyman informed police that Anthony's last name was Patterson.

{¶ 47} Second, regarding the amount of time he spent with appellant on October 12, 2016, Pennyman testified on direct examination that he was with appellant and Perkins at Anthony's house from approximately noon or 1:00 p.m. to 7:00 p.m. During his interview with Sgt. Lally, Pennyman asserted that he was with appellant for approximately one hour before the barbershop robbery.

{¶ 48} Third, regarding the reason the group went to the barbershop, Pennyman testified at trial that the group went to the barbershop to rob the place. During his interview with Sgt. Lally, however, Pennyman asserted that he went to the barbershop with Perkins and appellant to get a haircut. Pennyman acknowledged at trial that this statement was not true, and he explained that he lied because "that's what [Perkins and appellant] told me. It's a code, I guess." (Tr. 404.)

{¶ 49} Fourth, regarding the timing of the discussion about robbing the barbershop, Pennyman asserted during his July 21, 2017 interview that appellant and Perkins discussed the plan to rob the barbershop while they were driving on the freeway from Anthony's house to the west side. Pennyman testified at trial, however, that this statement was not true, and that there was no plan to rob the barbershop until they drove past the barbershop after the unsuccessful attempt to rob his stepfather's house.

{¶ 50} Fifth, regarding who appellant called to report his observations from inside the barbershop, Pennyman testified at trial that appellant called both Perkins

and Anthony from inside the barbershop. During his interview with Sgt. Lally, however, Pennyman asserted that appellant called Anthony, not Perkins, from inside the barbershop.

{¶ 51} In addition to these inconsistencies, Pennyman did not mention the attempt to rob his stepfather's house during his interview with Sgt. Lally. Pennyman explained on cross-examination that he did not mention it during the interview because he felt it was not important.

{¶ 52} After reviewing the record, we are unable to conclude that appellant's convictions are against the manifest weight of the evidence based on the aforementioned inconsistencies between Pennyman's statements to Sgt. Lally on July 21, 2017, and his testimony at trial. The inconsistencies do not cast serious doubt on appellant's involvement in the barbershop robbery. The important aspects of Pennyman's testimony remained largely consistent over time, including appellant devising the plan to rob the barbershop and going into the barbershop before Perkins and Pennyman to assess the situation and report back to the individuals in the car.

{¶ 53} Pennyman acknowledged the terms of his plea agreement several times during trial. When he provided his statement to police on July 21, 2017, he had been bound over to adult court. In exchange for his cooperation and testimony against appellant and Perkins, the case would be sent back to juvenile court for disposition. Pennyman acknowledged that he provided the statement to police on July 21, 2017, so he would "get less time." (Tr. 502.) He explained, however, that at

the time of trial, he had not been advised about how much time he would have to serve.

{¶ 54} Pennyman acknowledged that he was not truthful when he spoke with police at the hospital immediately after the incident. Pennyman asserted to police that he had merely been walking by the barbershop, rather than inside the barbershop and involved in the robbery. Pennyman testified at trial that he did not tell police what happened or who was involved because he does not talk to the police. He subsequently explained that he did not have an attorney when the police initially questioned him at the hospital, and, after he was represented by an attorney, he agreed to speak with the police about what transpired.

{¶ 55} Pennyman explained that he eventually agreed to cooperate with police because his mother begged him to tell the truth. He talked to his mother at the hospital, but did not tell her what happened at this time. He subsequently told his mother "[t]hat they made me do it." (Tr. 432.) Pennyman confirmed on cross-examination that he agreed to speak with police on July 21, 2017, because his mother begged him to tell the truth.

{¶ 56} Pennyman also acknowledged that he was supposed to tell the truth during the July 21, 2017 interview, and that he did not do so. He explained, however, that only some of his statements were false or misleading — not his entire statement. Pennyman asserted that he "just didn't tell [Sgt. Lally] everything." (Tr. 463.) On redirect examination, Pennyman confirmed that his trial testimony was the truth

about what transpired at the barbershop, and he was not merely stating what the prosecutor wanted to hear about the incident.

{¶ 57} Regarding his general outlook after the October 12, 2016 incident, Pennyman testified that his life changed in a good way after surviving the gunshot wound to the chest. Pennyman explained that he learned a lesson from the incident and realized he must have survived for a reason.

{¶ 58} The record reflects that Pennyman testified about his involvement in the robbery, the fact that he was not truthful when he spoke with police at the hospital, the fact that he was not entirely truthful when he spoke with Sgt. Lally on July 21, 2017, his plea agreement with the state, and the inconsistencies between his statement to Sgt. Lally and his testimony at trial. Accordingly, the jury, as the trier of fact, had sufficient information to assess the credibility of all of the witnesses, including Pennyman.

{¶ 59} To the extent that appellant argues that the evidence established that he was a victim, not a participant in the robbery, we disagree. As noted above, the state's theory of the case was that appellant was an accomplice of Perkins and Pennyman, and he entered the barbershop before them as a "look-out" to assess the situation and report back to the individuals in the car outside. On the other hand, the defense's theory of the case was that appellant was a victim that had no involvement with and did not participate in the robbery.

{¶ 60} "'[A] conviction is not against the manifest weight of the evidence simply because the jury rejected the defendant's version of the facts and believed the

testimony presented by the state.'" *State v. Jallah*, 8th Dist. Cuyahoga No. 101773, 2015-Ohio-1950, ¶ 71, quoting *State v. Hall*, 4th Dist. Ross No. 13CA3391, 2014-Ohio-2959, ¶ 2. In this case, the jury did not lose its way in resolving the conflicting theories based on the evidence presented at trial.

{¶ 61} The record reflects that aspects of Pennyman's testimony were consistent with the testimony of Ahmad, Espinal-Collazo, and Suleiman. Ahmad and Suleiman both testified that appellant was on his cell phone when he sat down in the lobby of the barbershop. Less than two minutes after appellant entered the barbershop, his accomplices Perkins and Pennyman entered the shop with their guns drawn. A reasonable inference can be made that after entering the barbershop and assessing the situation inside, appellant communicated his observations to his accomplices who entered shortly thereafter.

{¶ 62} Ahmad testified that when Perkins and Pennyman entered the shop brandishing their guns, appellant was "calmly sitting" near the entrance. (Tr. 266.) Appellant was "still calmly sitting" when shots were fired. (Tr. 268.) Based on this testimony, a reasonable inference can be made that appellant was an accomplice of Perkins and Pennyman, not a victim. Unlike Suleiman who dove to the ground to shield his nephew, and unlike Ahmad, Espinal-Collazo, and Suleiman who ran to the bathroom to take cover and hide immediately after the shootout, appellant was sitting calmly in his chair when Perkins and Pennyman entered the shop, and when the shootout began. Therefore, a reasonable inference can be drawn that appellant

knew Perkins and Pennyman were coming, he was not startled by them, and he did not feel that he was in danger.

{¶ 63} Finally, appellant also appears to suggest that Suleiman improperly and prejudicially testified that appellant "looked suspicious." Appellant appears to argue that this statement was based entirely on appellant's race, and that the improper comment inflamed the jury and contributed to the jury losing its way. Appellant's argument is unsupported by the record.

{¶ 64} Initially, appellant's counsel did not object to Suleiman's statement. Accordingly, appellant has forfeited all but plain error. Nevertheless, Suleiman explained why appellant looked suspicious when he entered the barbershop. Suleiman testified that appellant stood out to him when he entered the barbershop:

> [Appellant] [j]ust looked suspicious. Like, you could read suspicious off of somebody's face. He came in asking for a lineup, and then he said, I'm having my nephew, my brother or someone come up here. In two minutes, five minutes later, however long it took, two people come in with firearms. He didn't need a lineup. He was pretty good.

(Tr. 311.) Contrary to appellant's assertion, the record reflects that Suleiman's statement about appellant looking suspicious was based on Suleiman's observations rather than appellant's race.

{¶ 65} For all of the foregoing reasons, we find no basis upon which to conclude that appellant's convictions for aggravated robbery, aggravated burglary, felonious assault, kidnapping, and having weapons while under disability are against the manifest weight of the evidence. This is not an exceptional case in which the evidence weighs heavily against appellant's convictions or that the jury clearly

lost its way in finding appellant guilty. Accordingly, appellant's first assignment of error is overruled.

## III. Conclusion

{¶ 66} After thoroughly reviewing the record, we affirm the trial court's judgment. Appellant's convictions are not against the manifest weight of the evidence, and appellant's convictions for aggravated burglary were supported by sufficient evidence.

{¶ 67} Judgment affirmed.

It is ordered that appellee recover from appellant costs herein taxed.

The court finds there were reasonable grounds for this appeal.

It is ordered that a special mandate issue out of this court directing the common pleas court to carry this judgment into execution. The defendant's convictions having been affirmed, any bail pending is terminated. Case remanded to the trial court for execution of sentence.

A certified copy of this entry shall constitute the mandate pursuant to Rule 27 of the Rules of Appellate Procedure.

_____
FRANK D. CELEBREZZE, JR., PRESIDING JUDGE

KATHLEEN ANN KEOUGH, J., and
EILEEN A. GALLAGHER, J., CONCUR